[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. PROCEDURAL HISTORY OF THIS HABEAS PETITION
This petition was initially brought in three counts claiming that the petitioner's confinement is illegal on the basis that he was rendered ineffective assistance by counsel, that he is factually innocent, and that his conviction was tainted by prosecutorial misconduct. Subsequently, the petitioner abandoned his claims relating to the effectiveness of counsel and prosecutorial misconduct. He is proceeding solely on the basis of factual innocence as set forth in Count One of his Amended Petition dated May 28, 1993. The hearing on the merits of this habeas petition was conducted on various days commencing on December 15, 1995 and concluding on February 1, 1996. In addition to the trial testimony, the court has reviewed the numerous exhibits introduced by the parties during the hearing, including transcripts of the underlying criminal procedure.
II. SUMMARY OF TRIAL AND APPEAL
Proper consideration of the claims set forth in this matter requires a review of the criminal proceedings leading to the petitioner's conviction as well as a review of the evidence proffered at the habeas hearing.
At the criminal trial the State's case consisted of circumstantial evidence as well as identification of the petitioner by the female victim. Because the evidence adduced at the habeas hearing both adds to and implicates the reliability of the underlying conviction, this memorandum includes substantial details of the trial evidence.
The petitioner was convicted following a jury trial of two counts of Assault in the First Degree in violation of C.G.S. § 53a-59 and was sentenced to a total effective sentence of thirty two years of confinement in the custody of the Commissioner of CT Page 1825 Corrections. The petitioner is presently an inmate serving the sentence imposed by the court.
At the criminal trial, the petitioner was represented by Attorney Stephen Donahue. The State was represented by State's Attorney Walter Flanagan.
The underlying facts may be summarized as follows. On the evening of August 20, 1981, at approximately 8:30 p. m., two teenagers, fifteen year old Elizabeth and sixteen year old William, were assaulted behind the United Methodist Church on Clapboard Ridge in Danbury. As the teenagers were leaving the area, the assailant, a white male, approached them and identified himself as a police officer. He was wearing a bandanna covering his face from the bridge of his nose downward, and he was carrying an instrument that appeared to be a gun. He forced the couple to walk to a grassy area where he handcuffed William's wrists behind his back. The assailant also removed his belt and used it to bind William's feet. He then forced Elizabeth down an embankment where he began to assault her. Over the course of the next several minutes, the assailant severely beat and pistol whipped both teenagers. He wrapped his belt around William's neck, nearly strangling him and causing him to lose consciousness. During his assault on Elizabeth, the assailant's bandanna came off giving her some opportunity to see his face. As a result of these assaults both William and Elizabeth sustained severe, life threatening injuries for which they were hospitalized, and for which they required extensive medical care.
Prior to the trial, counsel for Mr. Miller filed numerous motions, including a Motion for a Change of Venue and a Motion to Suppress. Both motions were heard shortly before the commencement of trial, and both were denied. Following his conviction, the petitioner filed an appeal with the Supreme Court in which he claimed, inter alia, that the court erred in denying his pretrial motions for a change of venue and to suppress, in not letting into evidence the results of a polygraph examination he had taken, and by its ruling allowing into evidence testimony relating to the distribution of a certain brand of handcuffs to the Federal correctional system. In sustaining the defendant's conviction the Supreme Court said the following in regard to the identification procedure: "After a careful review of the record in light of these factors, we conclude that even if the identification procedure employed was unnecessarily suggestive, Elizabeth's out-of-court and in-court identifications were sufficiently reliable under the CT Page 1826 "totality of the circumstances" to be admissible at trial. State v.Miller, 202 Conn. 463 (1987).
As to the petitioner's claim that the trial court should not have permitted testimony from a witness, John Rimel, who was the civilian provost marshall for the Department of Defense Supply Depot in Mechanicsburg, Pennsylvania, the Supreme Court noted that the handcuffs used by the assailant were made an exhibit during the trial. Also, there was evidence that Miller had been a corrections officer at the Federal Correctional Institute in Danbury with access to handcuffs, and that at an earlier date he had been a corrections officer at the Federal Correctional Institution in Atlanta, Georgia. There was testimony that the particular set of handcuffs put on William's wrists were manufactured by the Peerless Manufacturing Company and were stamped with the numbers 818583. Mr. Rimel testified that the defense depot supplied handcuffs to the Defense Department, Justice Department, and Federal correctional institutions. He also stated that the particular set of handcuffs used by the assailant on William had been purchased as part of a large contract from Peerless, and had been received by the Defense depot in Mechanicsburg in 1977. He testified that the handcuffs were then sent to seven agencies — four supply depots for the Defense Logistics Agency including the depot in Mechanicsburg, Pennsylvania, as well as the Department of the Navy at San Diego, Oakland, and Norfolk. He also indicated that the Federal Correctional Institution in Atlanta was one of the institutions supplied with handcuffs from Mechanicsburg. On cross examination, he admitted that he could not state when or to what governmental agency or institution the particular set of handcuffs used by the assailant had been shipped. The petitioner objected to this evidence as too remote and speculative. In rejecting his appeal on this basis, the Supreme Court opined, "Under the circumstances, where there was evidence that the defendant was employed at federal correctional institutions, testimony that handcuffs of a particular manufacture were supplied to those institutions had some tendency to prove that the defendant may have had access to handcuffs of that brand name." Id. at 482.
As to the petitioner's claim that the court erred in refusing to admit the results of his polygraph examination, the Supreme Court has consistently held to the view that such results are not sufficiently reliable to be admissible. As a result, this court did not consider this claim; nor was there any further evidence in this regard in the habeas proceedings. CT Page 1827
III. THE TRIAL EVIDENCE
The petitioner was convicted on the basis of circumstantial evidence as well as a positive identification by one of the victims. At trial, both teenage victims testified. William indicated that on the evening in question he and Elizabeth had walked down the hill to a convenience store where they bought snacks at approximately 8 p. m. He testified that they then sat on a wall, ate their food, and then saw a male walking down the hill William indicated that the two of them then cut through a trail leading to a fort, and they walked through the fort when they noticed someone running by. William indicated that he and Elizabeth passed through the fort area between 8 p. m. and 8:15 p. m. He indicated that when they got to a corner area they saw a man on the sides of the swings, and they headed down a gravel path towards the swings when the man came out, approached them, and said he was a police officer. William first noticed the man from a distance of about five feet. He indicated that the man was wearing a blue bandanna across the bridge of his nose with his eyes and forehead visible. William stated that the man was wearing a plain blue shirt; he did not notice the man's pants or shoes. He testified that the man was pointing a gun at them which looked like a military side arm, an automatic, black, medium size and squarish in shape. William stated that, as the man was holding the gun out, he was not doing anything with his left hand. William said that the man had a few lines in his forehead, and bluish greenish beady eyes. The man appeared to be approximately 5'10", with brownish blond hair with traces of grey and a receding hairline. He also indicated the man had a reddish complexion, and was fat, with a small pot belly. He estimated the man's age to be between thirty five and forty five. William testified that the man handcuffed him, had him kneel down, and said that if he did not listen he would kill Elizabeth. He indicated that the man told him to lie on his stomach and that the man tied his ankles with his belt. William estimated that these events occurred at about 8:15 p. m., or it may have been closer to 8:20 p. m. He stated that the man then grabbed Elizabeth by the arm and started walking down the hill from which he returned in five to ten minutes when he took the belt of his ankles and put it around his chin. He also indicated the man stuck the gun in his mouth and then ripped his head away. William indicated that he passed out while the man was strangling him with the belt. He characterized the lighting as pretty good in the latter moments of his consciousness. William later awoke in the dark and went to Elizabeth's nearby home for help. He was subsequently taken to the hospital where he was admitted with CT Page 1828 serious physical injuries. While William was never able to identify the assailant from photographs, he indicated that the man he and Elizabeth later saw at a store in July of 1982 was the petitioner.
Elizabeth testified that on the evening in question she was wearing a pair of jeans, high top sneakers, a light green shirt, and a sweat jacket. She indicated that after she and William left the convenience store, they went back up the hill to the fort area where she sat down on a sleeping bag. She indicated she had returned to the fort area where she and William had been before to retrieve her pocketbook. She testified that she first saw a man in the swing set area about fifty feet away and that he was wearing tan pants. She described the man as having a large build, a fat forehead, blondish brown hair with grey going through it. She said he was tall, about 5'9" to 5'10", and he was fat. She indicated that when they neared the man, he grabbed William's arm and said he was a police officer. He had a squarish, black gun and was wearing a blue bandanna. She indicated that the three of them walked over to the trail, with the man somewhat behind William and her, while holding onto William's arm. She indicated that the man had handcuffed William's hands behind his back. She indicated that, at one point, the man grabbed her arm and she pulled away, and he grabbed her again and started to pull her down the hill. At that point, she indicated, the man stopped, took his belt off and wrapped it around William's ankles, and then he started pulling her down the hill. She said the belt was black, medium width. Elizabeth testified that she struggled with the assailant, and that he told her to take off her jacket. She indicated that the man grabbed the front of her jeans and kept pulling on them, and that he somehow managed to get her sweat jacked off. She said that she hit the man with her hand, and he struck her with the gun. She indicated that the man called her a "slut" and she swore back at him. During the struggle, she said, the bandanna came off the man's face and she was able to see him clearly. She indicated this occurred while it was still light, after the man had struck her head four or five times. She indicated that at one point, after the bandanna had fallen from the man's face, he put it around her neck and tied it tightly. Elizabeth testified that she finally stumbled and fell and began to lose consciousness. She testified that she regained consciousness while it was still fairly light and saw the man crouched down in front of her just a few feet away, and that he was sort of laughing. She indicated that he grabbed her foot and started dragging her down the hill further. She testified that she did not know if she had her clothes on at this juncture, though she knew that when the man started to drag her one of her sneakers came CT Page 1829 off. She testified that she threw the sneaker which struck the man in the crotch. He started fighting again, kicking her in the stomach and hitting her in the head. She said the man was wearing work shoes. Elizabeth testified that it was dusk when she lost consciousness for the second time while the man was hitting her in the head with the gun. She indicated that while she was conscious, she had the opportunity to observe the man's facial characteristics at a distance from two to three feet for two to three minutes, and she observed that the man had a fat forehead, small blue, beady eyes, with lines in his forehead, and reddish complexion. She described his face as large, fat. And she indicated that his chin appeared to be like a double chin, or two chins. She described the man as in his early 40's, and said that he reminded her of Archie Bunker. She testified that when she woke up, she did not know whether she had her clothes on, but she was cold, and it was dark, and she thought she had a sweat jacket wrapped around her neck.
On further examination at the trial, Elizabeth indicated that she had given a written statement on September 4, 1981, in which she had described the man as 5'6" tall, with broad shoulders, husky with a small pot belly, with brown, slightly wavy hair combed straight back and a lot of grey going through it, with a reddish face with a thickly lined forehead, a cleft in his chin, and a shiny silver cap or filling on his lower rear teeth, a man who looked like Archie Bunker in regard to his hair, the shape of his face and possibly his eyes, and wearing tan work pants with a light blue vee neck shirt with an animal on the pocket on one side, and dark blue trim on the collar and short sleeves. Elizabeth also testified that in her September 4, 1981 statement, she had indicated that the man held the gun awkwardly in his left hand, while he held the handcuffs with his right hand.
With respect to her subsequent identification of the assailant, Elizabeth testified at the criminal trial that she did not remember the first time she was able to recall events, but she did recall when the detectives visited her to have her do a composite. She also indicated that she had viewed approximately three hundred seventy seven photographs of white males. At the criminal trial, during cross examination of Elizabeth, she was shown a photograph, identified as Defendant's Exhibit 20, which she identified as the man who assaulted her. Looking at Exhibit 20, Elizabeth stated that she had not previously seen the picture, but, "I just recognize him." Petitioner's Exhibit 1, T. 140, November 9, 1983. Later in the trial there was evidence that this was a photograph of someone other than Miller. She also looked at Defense CT Page 1830 Exhibit 17, which she identified as her assailant, and she indicated that she had been shown this particular picture sometime after April 1, 1982. Later evidence indicated that she had been shown Defense Exhibit 17, a photograph of Miller, sometime earlier than April 1, 1982, and that she had made no identification from it. At trial, she was also shown another photograph, identified as Defendant's Exhibit 18, from which she was not able to make an identification. Although it was not made clear to the jury from subsequent trial evidence, it is apparent to the court that Defendant's Exhibit 18 was also a photograph of Miller.
At trial, Elizabeth was also shown a group of photographs identified as defendant's Exhibits cc, consisting of six photographs affixed to a file folder, from whom she was not able to pick out anyone as the assailant. Subsequent trial testimony indicated that Miller's picture was among this group and had previously been shown to Elizabeth in January or February of 1982, when she had also failed to identify him from the group. Finally, she was shown the group of colored photographs she had been shown on April 1, 1982, and from which she had first selected a photograph of Miller. She was able to re-identify Miller from this group. She indicated that when she first saw this photograph, she had told the police that she was 99% sure that the man in the picture was the assailant, but that she wanted to see him in person before making a 100% identification.
Elizabeth also testified that after she had made a 99% identification of Miller on April 1, 1982, she went to a church parking lot in Brewster, New York on three occasions where she sat in a car with Danbury police officers and observed people departing from church service. She testified that she recognized no one on any of these occasions.
In later trial testimony, Det. Nelson Carvalho of the Danbury Police Department testified that he was certain Elizabeth had been taken to the church on one occasion when the police knew Miller was in attendance, but he was not sure whether she had actually been taken to the church on any other occasions or merely held in readiness in the area in the event the police learned that Miller was at the church. While Det. Carvalho's and Elizabeth's testimony were not in harmony as to the number of times she actually went to the church in New York, the jury could have reasonably inferred from the evidence that each time she was taken to the church parking lot, Miller was among the church attendees, and that she did not identify him from personal observation. The jury could also CT Page 1831 have reasonably inferred that on one occasion, Det. Carvalho observed Miller while Elizabeth made no identification. Whether her failure to identify Miller was as a result of actually not seeing him, or seeing but not recognizing him, was a factual issue for the jury's determination.
Elizabeth testified that on July 12, 1982, while she and William were shopping at a Bradlees store, she recognized Miller as the man who had assaulted her. She testified that he appeared to turn his face away from them. She also testified that she and William followed Miller in his vehicle, and that he was driving slowly on the highway. She testified that he took an exit from the highway which brought him close to Clapboard Ridge. Shortly after Elizabeth reported this event to the police, Miller was arrested.
During the trial, Elizabeth made a positive in-court identification of Miller as her assailant.
At the trial, Det. Carvalho stated that he took over the investigation of this crime in September when the first officer in charge, Lieutenant Tierney, retired for health reasons. Det. Carvalho indicated that he first spoke with Elizabeth two to three days after the incident while she was still in the Intensive Care Unit when, using an identi-kit, he had her assist in the preparation of a composite sketch of the assailant. Det. Carvalho testified that on the back of the composite he noted features or characteristics of the assailant as reported to him by Elizabeth during this first visit. They include the following: white male; 5'7" to 5'8"; very heavy, approximately 200 pounds; dark hair, grey going through it; wearing tan work pants, short up to the ankles; brown work shoes; light blue tee shirt, dark blue ribbed around the neck; victim stated subject reminded her of Archie Bunker; subject had either a silver or gold tooth in his mouth.
Det. Carvalho indicated that, during the fall and winter months, Elizabeth was shown numerous photographs, mainly mug shots of white males in the age range of thirty five to forty, and in the possession of the Danbury Police, as well as photographs of individuals whose names had come to police attention. He indicated that Elizabeth was not able to make an identification from any of the photographs. It is noteworthy that Det. Carvalho testified that up until December of 1981, Miller's picture had not been shown to Elizabeth. Later, on cross examination he acknowledged the likelihood that Elizabeth had probably been shown two pictures of Miller, identified as Defendant's Exhibits 17 and 18 by Lt. CT Page 1832 Tierney, during September, and he confirmed that Elizabeth had not made any positive identification of her assailant prior to April 1, 1982. He did indicate that he had shown her a folder of six pictures which included Miller's photograph in January or February of 1982, and that Elizabeth had not made any identification from the group. Det. Carvalho indicated that while he was not aware of the date of the photograph of Miller which was included in the folder, he believed it was a shot of Miller from the Federal Correctional Institution.
While Det. Carvalho's testimony was somewhat confusing, a fair reading of the testimony suggests that prior to Elizabeth's 99% identification of Miller on April 1, 1982, she had been shown three other photographs of Miller from which she had made no identification. One of these was affixed to a file folder as one in a group of six and was apparently a photograph of Miller taken at a Federal correctional institution. The other two photographs were casual poses of Miller apparently shown to Elizabeth prior to April 1, 1982, most likely by Lt. Tierney in September, before he left the department. The confusion about this issue was noted by the Supreme Court in its discussion of the Motion to Suppress. cf.State v. Miller, 207 Conn. 463, 472.
While there was considerable testimony about the injuries sustained by both victims, the trial evidence in this regard was essentially uncontroverted. Dr. Robert Fischl testified that Elizabeth had Group A positive blood, and William had Group B positive blood.
Detective Robert Shirk of the Danbury Police Department testified that he picked up a blue and white bandanna with fresh blood on it at the crime scene. The bandanna was marked as an exhibit. Later in the trial, Abraham Stolman, then the Chief Toxicologist for the State Department of Health, testified that he conducted blood testing on the bandanna and determined that the bandanna contained blood of Blood Type Group O. He also indicated that if Blood Types A and B are mixed, they neutralize each other, and will yield test results showing Blood Type Group O.
Also testifying at the criminal trial was Officer Elliot Brevard of the Danbury Police Department, who stated that he prepared a composite sketch of the assailant based on information given to him by William. He testified that the composite, from the bridge of the nose up, was developed from information received from William, while the rest of the composite came from a composite that CT Page 1833 Det. Carvalho had made. In preparing the composite, Officer Brevard received information from William which he noted on a form and on which he wrote that the man's forehead had wrinkles, his hair was wavy, dark brown and greying, and he had a receding hairline, he was medium height with a heavy build, a white male age thirty five to forty five. The composite itself was introduced as an exhibit during the trial. In addition to a sketch, the composite contains the following description: white male; approximately 5'10"; approximately 185-195 pounds; brown hair with traces of grey; small pot belly; light blue Polo shirt, dark blue ribbing neck and sleeves; age between thirty five to forty five; deep age lines on forehead; some type of line in middle of chin (outstanding).
William McChesney, an employee of the Federal Correctional Institute at Danbury, testified that Miller had been employed as a correctional officer at that facility during the time of this assault, and that the uniform worn at the time was a blue and gold blazer, grey or blue pants, a yellow or blue shirt with a black or blue tie and black oxford-type shoes. He also indicated that Miller had access to handcuffs. He indicated that it was the policy at the Danbury facility for new handcuffs to be stamped in the locksmith shop when first received. Mr. McChesney also testified concerning Miller's hair color in 1981 in comparison to its color at the time of the trial. As to the time of trial, he stated, "It looks a little darker." And, as to 1981, he stated, "Kind-the best I remember was reddish brown or reddish blonde, something like that." Petitioner's 1, T. 50, November 10, 1993.
Also testifying from the Danbury Correctional Facility was Stephen Hawes, a corrections officer, who asserted that when Miller came to work for the shift starting at midnight on the evening of August 20, 1981, he had abrasions across his knuckles and the back of his hand, scratch marks running down his arm, a scratch mark on the right side of his neck, and a red mark running down his face. He stated that Miller looked like he had been in a fight. On cross examination Mr. Hawes acknowledged that he did not report this information until shortly before the trial, when he called the State's Attorney's Office and volunteered the information.[1]
With respect to the issue of lighting, while the victims' actual opportunity to see the assailant was the subject of scrutiny on examination, records from the Naval Observatory were admitted to show that in Danbury on August 20, 1981 sunrise was at 6:08 a.m., and sunset was at 7:46 p. m. Additionally, Debra Sue Eddy, the proprietor of a liquor store adjacent to the convenience store CT Page 1834 visited by the victims, testified that when she left the liquor store at approximately 8:05 p. m. on the night in question, it was dark, but not pitch dark.
Miller testified in his own defense. He indicated that he lived with his wife to whom he had been married for seventeen years and that they had two children. He denied any involvement in the assault, and he denied that he sustained any scratches or cuts on the evening in question. He also denied that he had recognized anybody while he had been shopping at Bradlees on July 12, 1982, and he denied that he had tried to hide from or otherwise elude anyone who might have been in the store. He acknowledged that he had taken an exit from the highway bringing him close to Clapboard Ridge, a route he indicated to be one he had previously travelled to get home.
Miller testified that during the evening of August 20, 1981, he and his wife and children had visited his sister's house in New York to leave the children with his sister in preparation for a trip they had planned to take to Atlantic City on August 21, 1981. He testified that, in fact, he and his wife travelled to Atlantic City on August 21, and he produced documentary evidence regarding this weekend trip.
As to his physical appearance, he stated that he had gained forty to fifty pounds between the summer of 1981 and the time of trial, and he submitted several photographs of himself in July of 1981 to demonstrate that he was considerably thinner in 1981, when the pictures were taken, than he appeared at the trial. He also testified that he had never dyed or colored his hair. Miller testified that his blood type is Blood Group A negative.
With respect to his employment, Miller testified that he had been a corrections officer at the Federal Correctional Institution in Atlanta, Georgia from 1977 until 1978. He also testified that he is left handed, and that he uses his left hand to hold a weapon. He indicated that he has a few silver fillings in his mouth. When asked on cross examination whether he was familiar with marksman repeater guns, he answered in the negative. He said he had never used an automatic weapon in his career.
On cross examination, Atty. Flanagan asked Miller questions about a woman, Donna Colucci of Newark, New Jersey, whose name and address were listed on his Atlantic City hotel reservation confirmation card. While Miller indicated no knowledge of this CT Page 1835 person, Atty. Flanagan was able to elicit testimony from him that a man of the same last name was, at the time of the Atlantic City trip, serving a sentence at the Danbury Correctional Institution for racketeering. Later in the trial, as his last witness, Atty Flanagan called an investigator from his office, who testified that he had called Donna Colucci in Newark, and that she had told him her husband's first name. It was the same first name as the Danbury inmate. Along these same lines, Atty. Flanagan cross examined Miller about payment for his hotel room and for a bottle of wine while in Atlantic City. While this line of testimony was permitted on the basis of credibility, a fair reading of this testimony supports the conclusion that Miller did not effectively deal with questions relating to his holiday in Atlantic City.
Miller's wife testified that her husband was with her and other family members and friends on the evening in question in Brewster, New York, preparing for their trip to Atlantic City the next day. She testified that the photographs of her husband introduced through her were taken while on vacation in July of 1981, and showed his hair and his weight as it appeared during the summer of 1981. She indicated that her husband had gained considerable weight since the 1981 holidays. In support of this testimony, she indicated that she had an entire closet full of clothing her husband could no longer wear because of his recent weight gain. She indicated that on the night in question her husband did not have any scratches on his face or arms and, indeed, in all the years of their marriage, there had never been a mark or scratch on his face. She indicated that her husband wore spit-shined black oxford shoes to work, like military wear, and not at all like work boots. She testified that she accompanied her husband to Atlantic City on August 21, 1981.
Debra Lyn Oeschschlager, a friend of the Miller family, testified that she was with the Miller's on the night in question in Brewster, and that when she left at 8:30 p. m., Miller was still present. She also testified that Miller did not have blond or grey hair in the summer of 1981, and that he was a lot thinner in the summer of 1981 than he appeared at the trial.
Following jury deliberations of approximately two and one hours, Miller was convicted on both counts of Assault.
IV. THE HABEAS HEARING
The thrust of Miller's petition is that he is actually CT Page 1836 innocent of the crimes for which he was convicted. Prior to the commencement of the habeas hearing, Miller's counsel submitted an affidavit to the court in which counsel indicated that Daniel Johnston, an inmate of the New York Department of Corrections, had confessed to the assaults of William and Elizabeth on Clapboard Ridge in Danbury on August 20, 1981. On the basis of the contents of the affidavit, the court determined that Miller would be entitled to have a substantive evidentiary hearing on the merits of his claim, and that Daniel Johnston was a material witness. As result, Johnston was brought to court in New York State and questioned by a judge concerning his intentions to testify in the Connecticut proceedings. A transcript of Johnston's testimony in the New York court was made part of the evidence in this habeas proceeding. Respondent's Exhibit B.
Additionally, Johnston was brought from New York State to testify in this matter. Prior to Johnston's appearance, the court appointed Attorney Leo Flaherty to represent him in regard to his testimony. The court appreciates Atty. Flaherty's services in this regard. During Johnston's lengthy testimony, he gave a detailed inculpatory statement of his involvement in the August 20, 1981 assaults on Clapboard Ridge.
While the evidence at the habeas proceedings commenced with Johnston's testimony, there was also considerable other evidence bearing on the innocence of the petitioner. The evidence adduced at the habeas hearing may be broadly categorized as follows: Physical evidence; History of Johnston's statements regarding the assaults; Identification evidence; Identification process; and Circumstantial evidence. Each is separately discussed.
A. PHYSICAL EVIDENCE
1. Gun evidence
During the criminal trial, the State had marked as evidence two metal objects retrieved from the police at the crime scene. Since no gun was ever found, none was offered. It is clear from the habeas testimony that during their investigation of the assaults, the Danbury police determined that the metal pieces came from a Marksman pellet pistol, but no such evidence was offered at the trial. At the habeas hearing, Johnston testified that during 1981 he had lived at 4500 E. Ocean View Avenue in Norfolk, Virginia, in an apartment complex where he was the apartment manager. He testified that his duties included making repairs to tenants' CT Page 1837 apartments. Johnston also testified that he burglarized several of these apartments, and that from one of the apartments he stole a Marksman pistol in either the later part of 1980 or early in 1981. When shown the two metal pieces found at the crime scene, he identified one of them as a piece which he claimed had come off the pistol as he was pistol whipping Elizabeth. He noted during his testimony that the piece now had initials on it which he said were not there when he had the gun. Later in the hearing, a Danbury police officer testified that he carved his initials in the slide after it had been recovered from the crime scene, thus corroborating Johnston's claim that the initials had not been present on the slide when the gun was in his possession. Johnston also identified a gun, at this juncture a petitioner's exhibit for identification only, as identical to the pistol he used in the assaults.
Johnston testified that at one point, as he was holding the pistol by the barrel and striking Elizabeth, it flew apart. While he recognized the one piece of metal marked as an exhibit for identification as a part of the pistol that had flown off it, he was unable to identify the other piece, which appeared to be a spring.
Later in the habeas hearing, the court heard testimony from Dennis Catona, a gun smith from Wallingford, who was qualified as a firearms expert. Mr. Catona viewed the Marksman pellet pistol which had previously been marked as a petitioner's exhibit for identification, and he testified that the piece of metal identified by Johnston was, in fact, a slide for the pistol. He indicated that the slide was an exact match for the particular make and model of pistol. Additionally, he indicated that the other piece of metal was a spring from the same make and model of pistol, and he stated that the spring would have been ejected from the pistol if the slide had fallen off. He also indicated that this particular make and model pellet pistol is not sturdy enough for a hard impact, and that it would likely break apart, with the slide and spring coming apart, if the pistol were subjected to a hard impact. Thus, the pistol and the spring joined the slide as full exhibits.
Also testifying in regard to the pellet pistol was Jack Lee Zollars of Portsmouth, Virginia. Mr. Zollars testified that he had been given a Marksman pistol by his father which he identified as exactly like the pistol already in evidence. He indicated that at a later date he moved to 4500 East Ocean View Avenue in Norfolk, and that he had still owned the pistol when he moved into an CT Page 1838 apartment at that location in 1981. He testified that he had kept the pistol in a closet in his apartment, and that he moved from the apartment complex early in 1982. Mr. Zollars testified that when he was unpacking from his move, he noticed that the pistol was missing. He testified that he had not loaned it to anyone; nor had he taken it outside and misplaced it. When he was unpacking early in 1982 and noticed that the pistol was missing, he assumed that he had lost it in the move from 4500 Ocean View Avenue. Finally, Mr. Zollars testified that when he lived at 4500 Ocean View Avenue, he knew Daniel Johnston. He testified that Johnston had been the property manager as well as the person to whom he had paid his rent and that part of Johnston's job had been to do repairs as needed in tenants' apartments. Mr. Zollars has not seen or heard from Johnston since he resided in the Ocean View Avenue apartment.[2]
The court credits Mr. Zollars and Mr. Catona as knowledgeable, and trustworthy witnesses. Their testimony relating to the gun provides reliable corroboration which enhances the persuasiveness of Johnston's inculpatory testimony.
2. Sexual assault evidence
During the criminal trial, the State offered no evidence that the female victim had been sexually assaulted. In response to an earlier discovery motion filed by the defense, the State had indicated that it was not pursuing the sexual theory of the case. At the habeas hearing, Johnston testified that he sexually assaulted the female victim, having vaginal, anal, and oral intercourse with her. He denied that he ejaculated during either vaginal or anal intercourse. During his testimony, he gave a detailed account of his claimed sexual assault of the female victim including his assertion that she was conscious during his acts. His description of the manner of his assault would suggest that she compliantly participated in this behavior. He claimed that she removed her clothing on demand from him, and that she assumed a posture during his acts that was suggestive of willingness on her part. The court would characterize Johnston's testimony concerning the manner of his sexual assault as both elaborate and fantastic.
Atty. Flanagan, on the other hand, testified that he had ruled out that a sexual assault had occurred on the basis that the victim had told him that no sexual assault had occurred, and there was no evidence in the hospital records to support a prosecution for sexual assault. Also testifying at the habeas hearing was the female victim, who denied that she removed her clothing. Moreover CT Page 1839 she denied that any sexual assault occurred while she was conscious. She stated that she did not know what happened when she was unconscious.
At the criminal trial, only certain portions of the Danbury Hospital record pertaining to the female victim were offered into evidence. The complete record was made available during the habeas hearing. While the record does not conclusively disclose that the female victim was, in fact, sexually assaulted, there is substantial information in the record to support the belief that she was the probable victim of a sexual assault.
At the outset, the court notes that the female victim was discovered nude. The admission note made by a physician in the emergency room indicates that the patient states "raped." Petitioner's Exhibit 21. While the initial vaginal examination was minimal due to the seriousness of her injuries, gross examination revealed grass particles in her pubic area. Id. Danbury police officer Ingrid Yakacki, who went to the emergency room, filed an internal report which included a notation that a doctor said the girl had been raped. Petitioner's Exhibit 22. Hospital records reveal that on further examination, the female victim was found to have some bloodstain on the vulva with no laceration and bloodstained fluid in the vagina. P. 21. The laboratory work indicated that there was no sperm in the vaginal area. It also indicated vaginal culture, Seminal acid phosphates: Weak positive, slide adequate. Vaginal Aspirate, negative for seminal acid phosphates. P. 21. Additionally, the records indicated that there was bloodstain and grass particles on the vulva on both sides of introitus, vaginal fluid mildly bloodstained. P. 21. The records reflect that the victim was having a small amount of pinkish tan vaginal discharge on August 26 and August 27th. P. 21. Notes from a gynecological consultation on August 27th indicated that the physician discussed laboratory results with the victim's mother and suggested that tests could not confirm intra vaginal ejaculation, but that Dr. Mitchell suggests some introital bruising. P. 21. Additionally, the hospital records indicate that the victim's mother had revealed to the writer that the patient had told her she had been raped and assaulted. P. 21. Finally, there is information contained in the hospital record from which it is reasonable to conclude that while the female victim freely discussed various aspects of the assault, she did so with considerable denial. P. 21. The hospital's discharge diagnosis was of a probable rape and contusion. P. 21. CT Page 1840
While the court appreciates that the quality of the evidence available to the State's Attorney may not have supported a sexual assault prosecution, particularly in light of the female victim's assertion that none occurred, the court disagrees that there was no such evidence. This discussion of the female victim's hospital records is an unfortunate albeit necessary intrusion. If the record were devoid of any evidence in this category such a finding would directly contradict Johnston's evidence, thus eroding the linchpin of Miller's factual innocence claim. The presence of such information tends to corroborate Miller's essential claim even if the evidence of sexual assault, taken in its entirety, might not support a prosecution for that charge.
The court need not and does not credit Johnston's claims as to the manner of his assaultive behavior in order to find that the evidence supports a probability that, in fact, Elizabeth was the victim of a sexual assault. In this regard, the court is mindful that Johnston claims that he sexually assaulted Elizabeth while she was fully conscious, and he would have the court believe that this teenager compliantly removed her clothes at his command and participated with him in the sexual acts he described. The female victim, on the other hand, testified that when she struck the assailant in defense, he called her a "slut" while viciously beating her. The court believes that this aspect of Johnston's story is likely more the product of a perverse braggadocio and hatred of women than an accurate account of the details of his vicious attack. In this regard, the court credits the testimony of Officer Daniel Mallory Stephens of the Putnam County, New York, Sheriff's Department who, based on his experience in investigating crimes of a sexual nature, stated that it is within the character of sexual perpetrators that, once apprehended, they can be boastful, especially in regard to their own prowess, and it is not uncharacteristic that their boastfulness be untruthful. Thus, Officer Stephens indicated, he has seen, for example, sexual perpetrators who have claimed penetration when they had no intercourse, and they were, in fact, impotent. As is noted infra, Johnston has a history of crimes of sexual violence against women. While his testimony concerning the details of his assault does not fit the crime scene evidence or her testimony, his essential claim of a sexual assault is not contradicted by any physical findings. The court believes the physical evidence more clearly supports a conclusion that this brave young victim resolutely resisted, but was ultimately overcome by the more powerful and frenzied behavior of her assailant. The female victim's testimony that the assailant pulled at the front of her pants, coupled with the finding by the CT Page 1841 police of the female victim's clothing torn and strewn about the area of her assault, supports a finding that the assailant forcibly ripped the victim's clothing from her as she struggled with him. This crime scene evidence, coupled with the physical evidence found during examinations at the hospital, and the statements made to caregivers at the hospital, support the hospital's discharge diagnosis that the female victim was the probable victim of rape.
3. The Peerless handcuffs
During the habeas hearing, Johnston identified the handcuffs found by the police at the crime scene as a pair of handcuffs he stole from an apartment located within the apartment complex at Ocean View Avenue in Norfolk, Virginia. He testified that they were taken from an apartment where a woman named Roxanne lived, and he claimed that Roxanne used the handcuffs to tie her child to the crib when she wanted to go out. He claimed that the handcuffs were Navy property and that there were many sailors from the aircraft carrier U.S.S. Nimitz, stationed in Norfolk, who lived in the apartment complex. There was no independent corroboration of Johnston's story except that Mr. Zollars did testify that a woman named Roxanne had lived at the apartments while he was a resident there in 1981. Another witness, Patricia Hurley, a special agent for the Naval Investigative Service confirmed that the Nimitz had been homeported in Norfolk, and was in the general area in the first part of 1981.
After the criminal trial, Atty. Richard Emanuel of the Chief Public Defender's Office undertook Miller's appeal. Once the appeal was concluded, Atty Emanuel continued to represent Miller in an effort to discover evidence to support Miller's unwavering claim of innocence. Mr. Emanuel testified at the habeas hearing that he wrote to Mr. Rimel, who had been a trial witness, in an effort to learn more about the distribution of Peerless handcuffs. He was essentially unsuccessful. On January 18, 1996, counsel took the deposition of William E. Hoban in Philadelphia for use during the hearing. Mr. Hoban is the Associate Director for Materials Management, Defense Personnel Support Center, Defense Logistics Agency. Mr. Hoban identified a document as a contract with Peerless for ten thousand five hundred pairs of handcuffs and indicating delivery dates from December of 1977 to April 1978. The contract indicated delivery to a number of facilities including the supply depot in Mechanicsburg, three other supply depots, and a number of Naval facilities including Norfolk. He believed, from a review of the contract papers, that seven hundred pairs of handcuffs from the CT Page 1842 total contract amount were slated to be sent to Norfolk. Mr. Hoban's testimony was somewhat beneficial to each of the parties. On one hand he testified that it would be more likely that a pair of handcuffs from this contract would end up being used for military purposes than for other agency purposes, while, on the other hand, he indicated it would be highly unlikely that the handcuffs with the number stamp 818583 would have ended up at a defense agency supply point at Norfolk. He qualified this statement, however, with the comment that he has no idea what statement, however, with the comment that he has no idea what happens with a retail customer, such as a Navy.
It is the court's impression that Mr. Hoban stated his belief that while it is not likely the handcuffs in question were sent from Mechanicsburg to a depot in Norfolk, that supposition has nothing to do with the identity of the customer who ultimately wound up with them. He also added, in response to a question, that if a Navy organization at Norfolk was low on handcuffs and needed an immediate re-supply, such an organization could requisition them directly from the depot in Mechanicsburg.
Based on this equivocal habeas testimony, it is the court's view of the evidence concerning handcuffs, viewed en toto, that no reasonable inference could be drawn concerning the particular site or facility from which the handcuffs used in the assault were obtained.
The court also believes that both Miller and Johnston had access to handcuffs. The jury heard the evidence regarding Miller's access to handcuffs. At the habeas hearing, in addition to Johnston's testimony concerning the presence of sailors at the apartment complex, Special Agent Hurley testified that there were several thousand Naval personnel assigned in the Norfolk area at the time and that she was aware of no restrictions prohibiting military police personnel from bringing handcuffs to their homes after duty hours. The court is also satisfied from the evidence that, by reason of his employment, Johnston had access to all the apartments of the Ocean View Apartments.
4. The rash evidence
Both victims testified that the area to which they were brought by the assailant was "grassy". The female victim testified at the trial that at one point, after she had lost and regained consciousness, she saw her assailant crouched down in front of her CT Page 1843 just a few feet away. She said he grabbed her foot and started dragging her down, and she testified that she did not know whether she had her clothes on at this point. The Danbury Hospital records for the female victim introduced at the habeas hearing contain a nurses note for August 24th which indicates, "red rash noted on buttocks? poison Ivy." P. 21. The notes further indicate that on August 25th the red rash on the buttocks was still present. The note indicates the application of calamine to the rash. In two other places the hospital notes indicate that a cortisone based ointment was applied to the rash on the buttocks.
At the habeas hearing, hospital records from a hospital in Chesapeake, Virginia were introduced as evidence that Johnston was admitted to the Chesapeake hospital on August 23, 1981 at 11:45 a.m. with pneumonia. Petitioner's Exhibit 20. The history portion of the emergency room admissions form indicates that Johnston had just come back from New York where he had stayed for two to three days. A hospital note dated August 24th indicates that Johnston had a rash over his buttocks and lower back and it includes a history from Johnston of his having had exposure to plants or vines on the day or two prior to his acute illness. The hospital record contains the statement, "impression, contact dermatitis, most likely poison ivy or sumac." P. 20. At the criminal trial numerous police photographs of the crime scene were introduced in evidence. Although the photographs are all black and white, those photographs depicting the scene of the assaults show areas of mixed vegetation including various shaped low growing leafy plants. The area depicted can only be referred to as "grassy" in the sense that it is not paved, and it is not barren. In a case of circumstantial evidence, this coincidence of medical findings is a notable circumstance.
B. DANIEL JOHNSTON'S UTTERANCES
Over the course of years, Johnston has talked about the Clapboard Ridge Assaults to several people in a number of ways and in a variety of contexts. His statements about the assaults can fairly be described as ranging from gratuitous expressions of familiarity and indirections to his ultimate confessions. The court finds his early expressions of interest and knowledge of these assaults, his reported demeanor in discussing the assaults, and his ultimate inculpatory statements all probative as evidence supporting a belief that he, and not Miller, was the Clapboard Ridge assailant. These various instances are as follows. CT Page 1844
1. Early conversations with Miller and his family
At the habeas hearing, the petitioner's wife, Elizabeth Miller, testified that in the fall of 1982, after her husband had been arrested but before the trial, she was at home in Patterson, New York, when she noted Johnston arrive by car at their property. She testified that, at the time, that he reminded her, by physical appearance, of the composite she had seen in the newspaper. She mentioned this to her husband who went outside to speak with the person. Miller testified that, on this occasion, when he went to see who the person in the driveway was, Johnston appeared annoyed that he did not recognize him. He told Miller that he wanted to talk to him about the case, and he told Miller that he knew he had not committed the crime. He said he wanted to help Miller. Miller told Johnston that if he had any information about the assaults, he had to give it to the police or to his attorney. Miller testified that his curiosity was aroused by this meeting. He indicated that the meeting lasted about ten minutes and ended when Johnston told him that he would have to work on it. It appears that this meeting took place after Miller had been arrested in New York and while he was out on bail from the New York court before he agreed to waive extradition.
Johnston also testified at the habeas hearing that this conversation took place. As noted infra, he had also told the police at the New Milford interview that he had spoken to Miller about these offenses after Miller's arrest. Final corroboration of this meeting can be found in the habeas testimony of Det. Carvalho who stated that when Miller was arrested and brought to Connecticut he told the police about his earlier meeting with Johnston.
After the trial, Johnston returned to the Miller home where he left his business card. The card was made an exhibit at the habeas hearing. Petitioner's Exhibit 9. While the printed side clearly identifies it as a business card for Johnston, on the reverse side is writing which states; "Call me please, Dan Johnston Thank you." Id. Miller's wife testified that she telephoned him at the number on the card, and in the conversation Johnston indicated he had information, that he had heard two people were involved in it. Mrs. Miller testified that Johnston returned to her home a few months later and told her that Larry did not do it and that he (Johnston) was working on it. He told her that if he had any more information he would get back to her.
Mrs. Miller also testified that, after Johnston had been CT Page 1845 incarcerated, she wrote to him. In her letter, which was introduced as an exhibit and which was dated April 16, 1991, Mrs. Miller reflects her awareness that Johnston had spoken with Atty. Emanuel and that he had indicated he had information which could help, and she asked Johnston for help. Petitioner's Exhibit 13. In one portion of the letter she stated, "We know that it has been our faith in God and our unending hope that this cross that has been placed on us will be lifted. We have been through much and have fought a long and tedious battle which has taken its toll on all of us. We pray that this nightmare will end soon and we also pray that if it is possible, that you may be able to help us." Id. After Mrs. Miller wrote this letter, she did not hear from Johnston until the summer of 1995 when she received a letter from him and she visited him in prison in New York. In his letter to Mrs. Miller, Johnston stated that, "I have your letter in my cell dated April 16, 1991, and there is not a day that go's by that I do not read it." Petitioner's 11. In this letter, Johnston also complains about his attorneys and tells Mrs. Miller that Atty. Emanuel had told him first that the statute of limitations had run on the crimes and later had told him that, in fact, it had not run. Johnston indicated that he was upset and he thought that a visit from Mrs. Miller was in order. After this letter, which was postmarked August 21, 1995, Mrs. Miller and the petitioner's mother saw Johnston in prison in New York where they were with him for approximately two hours. Mrs. Miller testified while she and her mother were seated in the visitors' room, Johnston entered the room and told them they were late. When she mentioned the traffic, he said words to the effect of, "no, you're ten years late." In this conversation Johnston told the Miller women that it had been going on long enough and that he wanted to make it right before they died. He told them that he did it, and that only three people knew who did it, he and the two victims, and that he would not talk with any one about it, including the lawyers, except a judge. He told the women he had found God and that this is what God wanted him to do. He apologized for what he had done to them and to the victims. Mrs. Miller testified that during this conversation no promises or favors were made or requested, except that Johnston asked them to pray with him for forgiveness.
While the court is mindful of Mrs. Miller's obvious interest in this matter, the court found her to be a credible and sincere witness, and the court credits her testimony concerning her various contacts with Johnston as accurate and true.
2. Putnam County Sheriffs Department CT Page 1846
Retired Sheriff George Grenier of the Putnam County, New York Sheriff's Department testified that he had two conversations with Johnston about this case. He indicated that the first conversation took place after Johnston had been arrested by the Duchess County Sheriff's Department for parole violation. As is noted infra, this arrest took place in February of 1982; Johnston was released from Sing Sing Prison to continue his parole in March of 1982 following a brief period of incarceration. Sheriff Grenier saw Johnston after his release and after Miller had been arrested, but before the trial. Sheriff Grenier testified that, by this point, he had developed a strong suspicion that Johnston might be the assailant based on his long standing knowledge of Johnston.[3]
Therefore, when he saw Johnston, he asked him about the offenses. Sheriff Grenier testified that Johnston denied any involvement, and he told him he had an alibi, that he had been in the hospital in Chesapeake, Virginia on the day of the assaults. Sheriff Grenier testified that he called the hospital and learned that Johnston's alibi was not true. Sheriff Grenier said that at this point his suspicions about Johnston became heightened. The court agrees with the petitioner's statement of law that an attempt to fabricate an alibi may be admitted as evidence of consciousness of guilt. State v. Reid, 193 Conn. 646 (1984). His construction of a false alibi in this case is taken by the court as evidence of a consciousness of guilt.
Sheriff Grenier testified that he saw Johnston again, on the street and he asked him again about Miller. Sheriff Grenier indicated that Johnston said that Miller did not do it. He further testified that when he asked Johnston if he had done it, Johnston said that he was not going to deny that he did it, but he was also not going to admit that he did it. He told Sheriff Grenier that he would never go back to jail again, and that he would kill himself first. Sheriff Grenier stated that he believed this conversation took place in mid to late 1983. While there may be some confusion about the dates of his contacts with Johnston, the court is satisfied that Sheriff Grenier's testimony as to the contents of his conversations with Johnston was truthful and accurate. While those conversations are probative of Johnston's involvement in the assaults, evidence relating to Sheriff Grenier's suspicions of Johnston are not. Nor are his statements regarding his beliefs that Miller was not capable of committing the crimes.
In addition to his conversations with Sheriff Grenier, CT Page 1847 Johnston also had a brief encounter with Daniel Stephens of the Putnam Sheriff's Department. Sheriff Stephens testified that he saw Johnston in the summer of 1985, driving his motor vehicle in the opposite direction. When Johnston stopped his vehicle, Sheriff Stephens knew from history that such an act meant that Johnston wanted to talk with him. When he stopped and rolled down his window Johnston began the conversation with chit chat. Sheriff Stephens testified that Johnston then said, "Remember Larry Miller. He's the wrong man." This incident is probative of Johnston's unusual and lingering interest in these assaults. It is a part of the mosaic of proof of his guilt.
3. The New Milford Police Department
In February of 1983, after Miller was arrested but before the trial, Johnston was picked up by the New Milford, Connecticut Police Department. Detective Robert Lollie, a thirty three year veteran of the Danbury Police Department, testified at the habeas hearing that he received a call from a New Milford police detective who told him that Johnston wanted to talk with detectives from Danbury, New Bedford, New York, and the Putnam County Sheriff's Department. He and Detective Enteado went to Milford and participated in an interview of Johnston along with approximately six other detectives from various police departments. Det. Lollie testified that he taped the interview; a somewhat enhanced copy of the tape was marked as an exhibit and played during the habeas hearing. Petitioner's Exhibit 57. Listening to the tape, which is inconsistently audible, Johnston can be heard making some comments relevant to the issues in this case. The court also notes that at one point while Johnston was discussing the Clapboard Ridge assaults the tape stops, and it begins again at a later point in Johnston's conversation, making it clear that some portion of his comments relating to these assaults was not transcribed. The court accepts as true Det. Lollie's explanation that one side of the tape came to an end while Johnston was talking, and that while Johnston continued to talk, he removed the tape from the recorder, flipped it over, and returned it to the recorder, thus not recording what was said by Johnston in the process.
It appears that Johnston was seated at a table with the detectives and that one of them began the questioning. At one point Johnston can be heard stating that he learned in prison how to rob and kill, and he can be heard claiming, in a braggadocio manner, that he was so skillful with a knife that he could cut the throat of any of the officers present with a knife before that person CT Page 1848 could unholster his gun. He claimed that he walked around Attica with three knives. He also said that if someone would put a gun on the table with just one bullet in it he would tell them everything. On much of the tape there is little of substance, just bluster by Johnston. One detective can be heard, from time to time, reminding Johnston that he had asked to have the detectives present. At one point, an unidentified detective asked Johnston about whether he wears bandannas, and Johnston replies that he wears ski masks. He was also asked whether he had a pellet pistol, and he replies that he had a twenty two. At another juncture in the interview he is asked if he knows the Larry Miller case and he can be heard to say. "You shafted him, that's why. He did not do it." A detective can be heard asking him, "What makes you think he got shafted", to which Johnston replies, "Cause he didn't do it, that's why." Johnston is also asked, "You know for sure he didn't do it?" And he replies, "You're damn right I know for sure he didn't do it." Later, after the break in the tape, Johnston is asked, "Why are you so upset about Miller?", and Johnston says, "What do you think?". After a pause, he can be heard to say, "I don't like him." The detective then asks him, "Why did you get so upset if you don't like him?" Johnston replies, "Because I gave up a name on it when we started out, that's why." When asked what the name was, Johnston indicated "Gary Townsic (sic)", and he claimed that he had given this name to Det. Carvalho.
Det. Lollie testified that when Johnston was asked why he had been so upset when discussing Miller, he did not in fact, seem any more upset than at other times in the tape. This assertion was contradicted by Gorden Allen, an inspector with twenty years service with the Putnam County Sheriff's Department. Investigator Allen testified at the habeas hearing that he, too, was present for the New Milford interview. He testified that he had known Johnston from having had occasions over his career to interview him and to investigate incidents in which he might have been involved. He attended the interview because he had been told that Johnston wanted to confess to everything. He indicated that there were eight Johnston at the head, and that at the beginning of the interview it was his impression that Johnston was enjoying the interview, and not saying anything beneficial to anyone. His impression was that Johnston was there to entertain. From what can be heard of the tape, the court agrees that throughout much of the conversation, Johnston said nothing of substance. Investigator Allen testified that he was close to the last detective to speak with Johnston, and that he asked him what he thought of the Larry Miller situation. At the time of the questioning, Investigator Allen was aware that CT Page 1849 Johnston knew Miller. And Johnston gave another name, which Investigator Allen thought was Towsic. Investigator Allen recalled that Johnston said he knew that Miller did not do it, and he recalled that Johnston stated that he had even gone to the Miller residence and had told his wife that he did not do it. Investigator Allen testified that, during this particular questioning concerning Miller, Johnston's demeanor changed from his previous relaxed appearance, and that he became agitated, red in the face, and loud. He believed he recalled that Johnston pounded his fists on the table. This testimony of Johnston's changed demeanor is in stark contrast to Det. Lollie's recollection.
The court finds Investigator Allen's recollection of the events of this meeting, including his recollection that Johnston became agitated at the mention of Clapboard Ridge, to be clearer and more reliable that Det. Lollie's memory of the meeting. In addition, Investigator Allen's recollection that Johnston became agitated at the mention of this case is corroborated by the question, heard on the tape, asking Johnston what he was so upset about Larry Miller. It was Investigator Allen's recollection that, following this exchange about Miller, the interview came to a conclusion without further questioning.
Det. Lollie testified that when he returned to the police department he reported the interview to Det. Carvalho and Det. Capt. George Johnson and locked the tape in his desk drawer. The tape did not resurface until a few days before the start of this habeas hearing. Inspector Allen testified that when he returned home he called Sheriff Grenier on the phone to report. He testified that Johnston's reaction to the questioning about these assaults affected him and he wanted Sheriff Grenier to be aware of what had transpired. While this material should have been disclosed to Miller at the time of his criminal trial, this interview is also probative to his claim of factual innocence as it tends to demonstrate Johnston's unusual interest in the Clapboard Ridge assaults. The court discusses infra its view of the impact, on the criminal trial, of the failure of the Danbury Police Department to inform Miller's defense of the events of this meeting.
4. Contacts with Attorney Richard Emanuel
Atty. Emanuel represented Miller from the commencement of his appeal and throughout the pendency of the habeas case until the eve of trial when he withdrew, having been informed that he was likely to be called as a witness by the respondent. He testified CT Page 1850 extensively at the habeas hearing. Atty. Emanuel indicated that although when he first Miller, he claimed he was innocent, he did not particularly focus on his claim at that juncture since such claims are more the norm than the exception in his appellate criminal defense practice. He indicated that he wished first to read the transcript of the criminal trial. He stated that he received a call from Elizabeth Miller in February or March of 1985 concerning Daniel Johnston, and that after the call Mrs. Miller sent him the business card Johnston had left at her home. Atty. Emanuel then tried to contact Johnston, and first spoke with him by phone in April of 1985. He and Johnston then met face to face at a diner on May 7, 1985. Atty. Emanuel testified that, at this lunch meeting, Johnston stated that Miller did not commit the crime and that he wanted to help him clear it up. He told Atty. Emanuel that he had been a suspect, but that he had an alibi which had checked out. He told him that the alibi had to do with being a patient at the Chesapeake hospital on the day of the assaults, and he told him that Sheriff Grenier had confirmed his alibi. Johnston also give Atty. Emanuel the name of some possible suspects. He told Atty. Emanuel that he knew and was not fond of Miller. He told Atty. Emanuel that he hated to see an innocent man convicted of the crime and he gave Atty. Emanuel the name of his brother David Johnston, who he said was a retired Danbury police officer living on the West Coast. He said he would get his number for Atty. Emanuel. When they parted, Johnston said he would keep his eyes open. Atty. Emanuel believes he gave Johnston his legal card.
Prior to this meeting, Atty. Emanuel had not heard of Sheriff Grenier. Following the meeting, he contacted Sheriff Grenier and learned from him that Johnston's alibi had not, in fact, checked out. By that point, Atty. Emanuel had become suspicious of Johnston. Atty. Emanuel testified that he spoke again with Johnston in June of 1985, and they talked more about Johnston attempting to find a telephone number for his brother Dave, but the conversation was largely unremarkable. Subsequently, he sent a letter to Johnston in prison shortly after he had been arrested in New York in December of 1985 for murder. There followed a series of letters and furtive efforts on Atty. Emanuel's part to re-contact Johnston. He tried to visit him in prison in December of 1986, but Johnston refused the visit.
He wrote to him in December of 1986, but his letter was refused. Atty. Emanuel testified that from 1986 until 1989 he had no contact with Johnston. He wrote him again in September of 1989 indicating a desire to speak with him about Larry Miller and he CT Page 1851 received a reply from Johnston indicating he would see him. Thereafter, on December 20, 1989, Atty. Emanuel met with Johnston in a New York prison. During this conversation Johnston told Atty. Emanuel that he had relevant information about the assaults but he was not prepared to give him the information at that point in time. He stated that he would be willing to come forward with the information during calendar year 1990. He told Atty. Emanuel that the information he would provide would clear up the crimes. At the meeting, Johnston also gave Atty. Emanuel some names of people who, he said, were perhaps involved or knew something about the crimes. Atty. Emanuel testified that he believed he was receiving conflicting signals from Johnston. Following this meeting, Atty. Emanuel wrote to Johnston immediately, and then again in January and April of 1990. Johnston, however, was unresponsive. He again wrote to Johnston in March and August of 1992 with no response. In February of 1993, Atty. Emanuel sent two letters to Johnston, each one enclosing a newspaper article, and both dealing with the fact that Miller had been permitted furloughs. The articles were critical of the Connecticut Department of Corrections. He received no reply. Contrary to the implications of the respondent that these letters fed information about the assaults to Johnston, the court believes that Atty. Emanuel sent these particular articles in an effort to provoke Johnston to candor. In July of 1994, Atty. Paula Mangini Montonye, also of the Public Defender's Office, wrote to Johnston to inform him of her representation of Miller in this habeas petition, and suggesting that she intended to subpoena Johnston as a witness in this matter. She also asked him to provide her with any information he may have relating to the case. By letter dated October 14, 1994, Johnston wrote back to Atty. Montonye. In his letter, Johnston indicated that he was working on the appeal of his murder conviction, that he would not go to the parole board until the year 2027, and that until he got a fair trial he would talk with nobody. He suggested that it would be so long before he would be eligible for parole that he'd die before he was able to do all his time. He told her that he would make no deals, and closed with the suggestion that if she had something more to say to him she should feel free to write. Petitioner's Exhibit 45. By letter dated November 7, 1994, Atty. Montonye responded to Johnston in which she indicated that the intent of her earlier letter was not to threaten him, but simply to relay to him her desire to meet with him face to face. She re-iterated her desire to meet him. Johnston did not reply.
There was no further contact between Johnston and either Attys. Emanuel or Montonye until July 19, 1995, when the three of CT Page 1852 them met at the Great Meadow Correctional facility in New York. Atty. Emanuel testified that prior to this meeting, and in conjunction with the pending habeas matter, he had reached an accommodation with State's Attorney Flanagan that he would seek a modification of Miller's sentence before the original sentencing court. Atty. Emanuel testified that the State's Attorney had agreed not to oppose a motion for sentence modification and that he would not comment at any resentencing hearing. In return, Atty. Emanuel had agreed to withdraw the habeas petition. Atty. Emanuel testified that he decided, before actually going forward with the new arrangement, that he would take one more chance that he could see Johnston. Accordingly, he and Atty. Montonye travelled to Great Meadow on July 19, 1995 with no advance notice to Johnston in the hopes he would be willing to meet with them. He did. Atty. Emanuel testified that when they first greeted Johnston he re-introduced himself and introduced Atty. Montonye. He reminded Johnston that he had previously indicated he had information about these crimes and he told Johnston they had "hit the wall". Johnston next turned to Atty. Montonye and referred to her earlier letter concerning her intentions to subpoena him, and she asked him what he would say if subpoenaed. At this point, Atty. Emanuel indicated, Johnston stated, "I did it, I did it, I did the crimes." Atty. Emanuel next asked him if he had committed the crimes alone to which he said "Yes". Atty. Emanuel asked if Larry Miller was there and Johnston said "No". Atty. Montonye then asked Johnston if he was willing to put something in writing to which he replied in the affirmative. When he asked what he should write, Attorney Emanuel told him to write whatever he wanted to write. Johnston said he would put in the writing one detail that was not known. Johnston then made a writing which was notarized. He also drew a map. Both documents were marked as Petitioner's Exhibit 10 at the hearing. The "detail" to which Johnston was referring was his claim, in the statement, that he had stolen the handcuffs used in the crimes from an apartment in Norfolk, Virginia. The court finds that Johnston made the admissions as stated by Atty. Emanuel, and that his admissions were spontaneous. The court also finds that Johnston made his writing without tutoring by either counsel.
The court finds that Atty. Emanuel's testimony was accurate, detailed, and trustworthy. During his testimony, Atty. Emanuel stated that neither he nor Atty. Montonye made any suggestions to Johnston about the contents of his statement before he made it. The court accepts this testimony as true. And the court rejects, as unfounded, any claim that either Atty. Emanuel or Atty. Montonye fed Johnston information for him to "parrot" at the habeas hearing. CT Page 1853
During the habeas hearing, there was some suggestion, through questioning, that the letters sent to Johnston by Atty. Emanuel were threatening and suggestive in nature. While a review of this correspondence supports the view that, from time to time, counsel sought to cajole Johnston and to provoke him to candor by appeals to both his lessor as well as to more noble qualities, the court does not find them inappropriate in this context. In one letter, Atty. Emanuel suggests that he might have no choice but to go to the authorities or to the newspapers if Johnston is not willing to talk with him voluntarily. From Johnston's perspective, that letter could have been seen as threatening. It can not be construed, however, as a threat intended to induce Johnston to untruths or guile.
A review of the correspondence from Atty. Emanuel to Johnston reveals, in its worse light, the increasing frustration of an advocate sensing that the master key to real justice for his client was in the hands of this elusive and troublesome man. In the course of his investigation, Atty. Emanuel had spoken with a number of police officers from the Danbury Police Department, as well as from the Putnam County Sheriff's Department and he was aware that he was not unique in his growing belief that Johnston was the perpetrator. He had also obtained information about Johnston's character, and he had learned of his dislike for authority. And he had sensed that Johnston might like to show up the police for the mistake they had made. Finally, he had been told that Johnston had been, from time to time in his life, a person of religion. His letters, viewed entoto, reflect an appeal to all of these predilections. There is no evidence that, at any time, Atty. Emanuel suggested to Johnston that he fabricate a lie, or otherwise participate in any deception concerning these assaults.
Additionally, there is no evidence before the court that Atty. Emanuel's efforts caused Johnston to state any inaccuracies.
5. Johnston's in-court testimony
Subsequent to this July 19, 1995 meeting, Atty. Emanuel put the wheels in motion to have Johnston brought to Connecticut to testify in this action. As a part of that process, Johnston was brought to court in New York where he was placed under oath and invited to testify as to his involvement in the Clapboard Ridge assaults. While he initially invoked his Fifth Amendment privilege against self incrimination, he then gave testimony in which he CT Page 1854 stated that he had assaulted the two teenagers on Clapboard Ridge on August 20, 1981. While his testimony was less detailed than his subsequent habeas testimony, the court does not find that it was materially different. On the basis of his testimony, the New York court determined that he should be made available for testimony in this matter in Connecticut. Subsequently, he was brought to Connecticut to testify.[4]
During his testimony, Johnston provided many details of his assault on the two teenagers on the evening in question. He testified that on August 20, 1981 he had driven to the area from Virginia where he was then living. He stated that he drove from Brewster, New York to Danbury, and that from his car he saw the two teenagers departing a convenience store. He testified that the girl had a cigarette. He stated that he watched the pair through his rear view mirror and then parked his car on a side street nearby a real estate building. He claimed that, after leaving his car, he walked back down the hill on Clapboard Ridge, and the teenagers passed him going up the ridge. He observed the two going into the woods while he continued up the hill which had a church on the right. He said that at that point he looked around and noted that the two teenagers were walking toward the back of the church parking lot. Johnston claimed that he was wearing blue dungarees, a short blue sweat shirt and work boots. He said that he was wearing a blue and white bandanna, and that he had a pellet gun and a pair of military handcuffs. When shown the bandanna that had been made an exhibit at the criminal trial, he testified that he believed it to be the bandanna he was wearing during the assaults, though he stated that it was new when he used it, and now had holes and pen marks on it.[5] He stated that he approached the teenagers with the gun and told them they were under arrest, and, while pointing the gun at the male, told him to lie on the ground. He stated that he put the handcuffs on the male, with his hands behind his back, once he was on the ground. He stated that the boy then got to his knees, and he then picked up the boy by the handcuffs and walked downward with both the teenagers, trying to stay in the wooded area where they would not be seen. Johnston stated that once they got into the wooded area, he set the male off to his left side and the female off to the right. At this point, Johnston claimed, the teenagers told him they had no money and asked him what he wanted. He stated that he then reached over with his left hand and grabbed the girl's breast, stating, "I want some of this", and that she replied that she would rather die first. During his testimony, Johnston made reference to a sketch of the area and pointed out various places on the sketch where he stated these events took CT Page 1855 place. Johnston claimed that after he had grabbed the girl's breast, she said words to the effect of, "not up here, down further, I don't want him to see this." He claimed that he told her to go further down the hill and to take her clothes off. He stated that he next pointed the pistol at the boy's head and told him not to move. He also indicated that he removed his belt and wrapped it around the boy's feet. Following this, Johnston claimed, he went the female and had vaginal, anal, and oral sex with her. He claimed that she was fully conscious at this time. He testified that, after having sex with her, he began to beat her up, to pistol whip her, and that he was also striking her with his hands, fists, and feet. He stated that he took a shirt and wrapped it around her face as he was striking her. Johnston testified that at one point he left the girl and went to the boy where he took his belt and put it around the boy's neck, pulling him off the ground in an effort to choke him. He said he then returned to the girl and continued to beat her. He stated that during the assault he left the victims briefly and went up the hill to snort cocaine, after which he returned to the girl and began to beat her again. He claimed that she said words to the effect, "Mister, would you please kill me", and when he asked her why, she said, "I can't take this anymore." At this point he claimed, he looked at her and she had a jacket or pants around her face and he was covered with blood. He also claimed that as he was pistol whipping the girl, and while he was holding the pellet gun with the barrel in his hand, the bottom of it popped out. He stated that as he was getting ready to leave, he opened the girl's pocketbook and threw its contents on the ground to make it look like a robbery. He recalled seeing an unused tampon, some change, housekeys, cigarettes, and perhaps matches or a lighter. He stated that he left the scene through the woods to Clapboard Hill walking on the left side, and he noticed that as the car lights shone on him, his clothes and shoes were covered with blood. Accordingly, he said, he moved to the right side of the road so that the car lights would not shine on him. He claimed that he proceeded down the hill to the side street, got in his car, and drove on Interstate 84 toward Brewster. He claimed that as he got on the ramp, he opened his window and through the pellet gun out. He claimed this occurred at the foot of North Street and Clapboard Ridge Road. He stated that he got off the highway at a service area where there was a building in back of an information center, and that he removed his clothes there, rolling them up, and, after putting on other clothes, returned to his car and drove to the Mill Plain Road exit. He stated that just as he passed the New York State line on Route 6 heading toward Brewster, he got out of the car and tossed his clothes away. He claimed that he then drove CT Page 1856 toward Westchester County and stopped at a McDonalds in Bedford Hills where he called the State Police in Brewster. He claimed that he called 279-6162 and told the responding trooper that he had just left two people up behind a church on Clapboard Ridge Road. He stated that he then proceeded back to Norfolk, Virginia. Johnston testified that he had stolen both the handcuffs and the pistol from apartments located at Ocean View Avenue, where he stated he was then living.
Johnston indicated that he had been living in Norfolk, Virginia during the 1981 summer, on interstate parole from New York. He indicated that he had been placed on parole in New York in 1979 following completion of a sentence for an assault conviction. He also claimed that during the time period from 1980 to 1981, he travelled to New York and Connecticut from Virginia on numerous occasions to commit crimes for money. He indicated that at the time, he had family living in the Danbury area, including a brother Frank in Southbury, Robert in Danbury, Dave, who had retired from the Danbury Police Department, and a sister in Danbury.
Prior to Johnston's testimony in this matter, the court appointed counsel for him who privately conferred with Johnston. Counsel assured the court that Johnston had been fully advised of his constitutionally protected rights prior to his testimony. In addition, the court is satisfied, based on its questioning of Johnston, that during his inculpatory testimony he had a conscious awareness of the possibility that he could still, under certain circumstances, be prosecuted for these crimes. While the court does not make any determination whether Johnston can, in fact, still be prosecuted, it is significant to the credibility of his testimony that he was under the belief, while testifying, that his inculpatory statements could be used against him to prosecute him. In this regard, it is also noteworthy that Johnston made his admission to Atty. Emanuel before there was any discussion of the statute of limitations. The court is satisfied from Atty. Emanuel's testimony that it was after Johnston had written and signed his statement on July 19, 1995 that he asked Atty. Emanuel about the statute of limitation. At that juncture, Atty. Emanuel told Johnston that the statute was five years. At a subsequent meeting, Atty. Emanuel suggested to Johnston that the statute had not, in fact, run in his case, and that he was exposed to a substantial period of incarceration for these crimes. This, the court believes, was Johnston's mindset while testifying in New York as well as before this court. His perception of jeopardy, whether realistic or not, is probative on the issue of his credibility. CT Page 1857
At the habeas hearing, while Johnston gave detailed testimony admitting his commission of the Clapboard Ridge assaults, counsel for the respondent correctly points out that much of what Johnston stated could have been read in the Danbury News Times. The court agrees. It is apparent from the articles written that this was a celebrated case in the weeks immediately following the assaults, and the trial was closely followed. It is also apparent to the court that Johnston had access to the newspapers. In fact, he testified that he followed the case in the newspapers and saw television reports about it. Respondent's suggestion that Johnston's access to newspapers would explain his ability to recite the details of the assault does not, however, explain the discrepancies in some of the details. Thus, the court believes that if Johnston were, indeed, "parroting", he could have claimed that he recalled the presence of the swing set instead of testifying that he did not remember seeing one. He could have claimed that the female victim was wearing green jeans, as reported in the newspaper, instead of testifying that she had on blue jeans. He could have stated that his blue shirt had dark ribbing about the sleeves and neck as reported in the newspaper, and that his shirt was a tee shirt, rather than a short sweat shirt, as he testified. These factors, together with the newspaper accounts that the female victim's clothes appeared to have been torn from her body, that her bra was in pieces, that her green dungarees were bloody, and that her blouse was torn, and her clothes were strewn about, belie the claim that Johnston is merely echoing what he read or was told. Aside from the discrepancy concerning the sexual assault, the court ascribes the variances between Johnston's account and the victims' as attributable to the passage of time since the assaults, the respective opportunities the victims and Johnston had for observation, allowing for the time of day of the assaults, while also allowing for Johnston's felonious exertions and the possibility of erroneous recollection by both him and the victims. Indeed, the court would have been more gravely concerned about Johnston's veracity had every detail he recited been a mirror of media reports. Certainly, if the petitioner's case consisted of no more than Johnston's unvarnished claims, his credibility alone, without the external corroboration presented during the habeas hearing, would not entitle Miller to relief.
Also, the court does not rely on Johnston's claim of a religious conversion to credit his testimony. So, for example, his claim that he decided to speak with the petitioner's attorneys on July 19, 1995 because he had found religion and more specifically CT Page 1858 because his religious reading for the day had been captioned, "Turn Yourself In", was not a factor for this court in crediting his testimony. Johnston further testified that he discussed his admissions in his prison bible study class. No matter how his spiritual quest may have motivated his ultimate revelations, the court is unimpressed with his claim that his new-found religious fervor has caused him to admit this crime while he maintains his innocence of a murder for which he has been convicted. For the court, there are some facets of Johnston's life, including his provocations, that are beyond the kin of this mundane factfinder.
His direct evidence, nevertheless, has substantial probative value. In addition to the corroborative evidence to which the court has referred supra, the court believes that Johnston has exposed himself to elongated incarceration in New York, as well as potential prosecution, as a result of his confession. Additionally, it is clear to the court that when he testified in court in New York as well as during his testimony in Connecticut he had the perception that his confession could expose him to prosecution. While his actual jeopardy, as opposed to any perceived jeopardy, may be a requisite ingredient to a definition of his testimony as a declaration against penal interest, his conscious subjective view that his testimony may expose him to prosecution is relevant to the court's consideration of the truthfulness of his testimony. Nor is it clear that he has no jeopardy. Connecticut General Statute 4-193
states, in pertinent part, "(c) If the person against whom an indictment, information or complaint for any of said offenses is brought has fled from and resided out of this state during the period so limited, it may be brought against him at any time within such period, during which he resides in this state, after the commission of the offense." In State v. Crawford, the Supreme Court construed that section of the statute to support a prosecution where an arrest warrant had been issued within the time period but not served until after the expiration of the period of limitation.202 Conn. 443 (1987). In a relevant footnote, the Crawford court stated, "General Statutes 54-193(c) does not require a different result. That subsection, which tolls the statute as to a person who has fled from and resides outside the state after the commission of the offense, simply extends the time within which an `indictment, information or complaint' may be brought. While under our present holding the issuance of an arrest warrant within the period of limitation might accomplish the same result, there may be valid reasons why the prosecuting authority cannot procure an arrest warrant while an accused is absent from the state." Id at 450. CT Page 1859
More recently, the Supreme Court determined that in a case in which an arrest warrant had been issued and vacated and then obtained again, but the second time after the expiration of the period of limitation, the question of whether the state executed the warrant within a reasonable period of time was properly a question of fact for the jury. State v. Ali, 233 Conn. 403 (1995).
In addition to the question of his jeopardy for prosecution, the court believes it is reasonable to consider that Johnston's testimony may expose him to the risk of elongated incarceration in New York. At the hearing, his present prison guidance counselor testified that his earliest possible parole date will occur in the year 2021. While the court is mindful that Johnston will then be seventy one years old, the court will not presume that at this point Johnston has foreclosed any possibility of freedom in his life time. The court will not dismiss as irrelevant to his credibility, Johnston's perception of his risk of further incarceration, either by way of prosecution for these crimes, or by denial of parole resulting from his admitted commission of these crimes.
C. THE IDENTIFICATION EVIDENCE
At trial, the heart of the State's case was the female victim's identification of Miller as her assailant. In this part, the court reviews the various identifications made by the victims during the course of the police investigation. Also, the court discusses additional facts concerning the identification procedures utilized by the Danbury police department leading to the victims' identification of Miller as the assailant. The court's purpose in this discussion of the trial evidence is not to second guess the original trial factfinders as to the correctness of their assessment of the evidence presented to them; nor is it to revisit the findings of the Supreme Court concerning the circumstances then known to the Court. Rather, the court believes it has a responsibility, in fashioning its response to this petition, to consider whether additional information brought to light in the habeas proceedings concerning the identification procedures implicates the fairness of the petitioner's trial. In this review, the court also discusses the physical characteristics of Johnston as they may correspond to the victims' descriptions of their assailant, as pertinent to the petitioner's claim of factual innocence.
It is a fair reading the victims' trial testimony that their CT Page 1860 descriptions of the assailant were consistent with one another with some differences relating to the assailant's height and age.
At the habeas hearing, however, it became apparent that the victims' first descriptions of their assailant were different in numerous respects from one another as well as from their later descriptions. A written report from Danbury Police Officer Ingrid Yakacki, who was dispatched to the hospital and spoke with both Elizabeth and William in the emergency room, indicates that Elizabeth described her assailant as fat, with blond hair and wearing a red bandanna and a plaid flannel shirt. At the trial, when Elizabeth was asked on cross examination whether she had told anyone that the man who attacked her was in his twenties, had blond hair, and a red bandanna and had a plaid shirt on, she initially said that she did not remember. When asked if she had at any time told anyone that, she replied that she did not think so. The same report indicates that William described his assailant as approximately 5'8" to 5'9" tall, husky build, medium length wavy dark hair, wearing a light blue tee shirt with dark blue trim, and carrying an automatic type pistol. William described the man as appearing to be in his late twenties.
While it appears, from Atty. Donahue's questions, that the information in Officer Yakacki's report concerning the victims' initial descriptions of their assailant may have been known to him at the time of trial, these differences in height, age, and hair color take on significance when compared and contrasted with Johnston's and Miller's physical characteristics. At the outset, the court notes that Miller and Johnston share some similarities. Johnston was born on September 4, 1950. Since Miller's date of birth is October 17, 1944, the two men are six years apart. At the time of the assaults, Miller was thirty six; Johnston was thirty. Johnston's parole records describe him as 5'11" tall, while Miller's Presentence Report lists him as 5'11". In the admission record for Johnston's Chesapeake Hospital stay, the space for weight stated, "245". In the space for height is indicated, "5'11"?". Since it appears that this information may have been given by Johnston's wife and not obtained by actual measurement, the court cannot rely on it as totally accurate. However, the court does note that on examination at the hospital, Johnston was found to be a stout, white male, well developed and well nourished. P. 20. Miller's Presentence Report indicated that his weight was 220 pounds. His eyes were described as hazel; his hair brown; his complexion as medium; and, his build heavy. At trial there was evidence that he had gained approximately forty pounds between the CT Page 1861 summer of 1981 and the date of the trial, and photographs of Miller, taken while in Florida in July of 1981, were offered as corroboration that he was considerably thinner in appearance in the summer of 1981 than he appeared at the trial. Both Miller's and Johnston's photographs, reasonably proximate in time to the assaults, reveal that they had receding hairlines. On the other hand, Johnston's hair appeared sandy brown at the habeas hearing; more significantly, it has been described as brown or blond in various criminal justice reports. In all pictures of Johnston, as well as in his habeas appearance, his hair is combed back. Miller's hair appears in color photographs to be dark brown or black. This issue was dealt with at the trial where the State offered a witness who testified that in 1981 Miller's hair was "reddish brown or reddish blonde, something like that." Petitioner's Exhibit 1, T. 50, November 10, 1983. Both Miller and his wife testified that he had never artificially colored his hair. Also, while photographs purportedly taken in July of 1981 show that Miller's hairline was receding, his hair is neither wavy nor combed back in any of them.
Johnston had many of the physical traits attributed to the assailant. While the estimates of his weight at the time appear to vary, he is consistently referred to as stout, and he is 5'11" tall. Johnston's fingerprint card is included as part of his parole records introduced at the habeas hearing. The card contains the notation that at age twenty eight, Johnston had blond hair, light complexion, husky build, blue eyes and weighed two hundred and fifteen pounds. Petitioner's Exhibit 57. On his criminal record, also introduced at the habeas hearing, Johnston is described as having been born on September 4, 1950, and as having blue eyes and blond hair. He is listed as 5'11" with weight of one hundred sixty five pounds. The date of this information is not self evident from the exhibit. Respondent's Exhibit A.
During the habeas hearing, the respondent offered as evidence a number of newspaper articles concerning these assaults. It is interesting that on August 30, 1981, the Danbury News Times reported that a police sketch of the assailant showed a fleshy faced man with a broad nose and thick lips. Respondent's Exhibit DD. At the habeas hearing, the court did note that Johnston has wavy hair, a large face with thick lips and a broad nose. Based on the court's observations of Johnston in the court room, these are words the court would include in a description of Johnston.
Based on these descriptions and comparisons, it is the court's CT Page 1862 view that reasonably contemporaneous photographs of Miller and Johnston around the time of the assaults suggests that they were similar in race, height, weight, and receding hair line.[6] On the other hand, only Johnston appeared to have wavy hair as described; Johnston's eyes are described as blue, while Miller's are characterized as hazel. While neither of the victims testified at either the trial or the habeas hearing that the assailant had a broad nose and thick lips, the composites as well as newspaper comments about them describe the assailant as having a broad nose and thick lips. These terms aptly describe Johnston's appearance. They do not match Miller. While Johnston's hair color matches the descriptions given by the victims, there was conflicting evidence concerning Miller's hair color at the time of the assault.
During the trial, Miller testified that he is left handed. At the habeas hearing, Johnston testified that he is right handed. Given the testimony of William that when he first saw the assailant he was holding the gun in his right hand, and Elizabeth's testimony that the assailant handcuffed William with his right hand while holding the gun awkwardly in his left hand, the evidence reasonable supports a belief that the assailant was right handed. Further supporting this conclusion is the evidence of William's trial testimony that once the assailant forced him to the ground, he took Elizabeth down the hill with his right hand. William testified that the assailant had switched the gun over to his left hand and grabbed Elizabeth with his right hand. Assuming that both Miller and Johnston were truthful in this aspect of their testimony, this evidence points more to Johnston than to Miller. The court credits the testimony of both Miller and Johnston as truthful in this regard.
D. THE IDENTIFICATION PROCESS
While the court believes that Johnston more closely fits the descriptions of the assailant given by the victims before Miller's photograph was selected, this finding does not implicate the constitutional fairness of the trial process. The court now turns to a discussion of the failure of the Danbury police department to bring Johnston to the attention to the victims, as well as their failure to bring certain information relating to Johnston to the attention of the State's Attorney's office in the investigative and accusatorial stage of the criminal proceedings.
At the outset, the court finds that two photographs of Johnston were in the possession and control of the Danbury Police CT Page 1863 Department at all times relevant to this assault, and that they were never shown to either of the victims. Additionally, the court finds that the police department never showed any photograph of Johnston to either victim. His photograph was not shown to the victims until State's Attorney Flanagan showed it to Elizabeth on the eve of trial in November of 1983.[7] The court notes, in this regard, that Elizabeth testified at the habeas hearing that the first time she ever saw any photograph of Johnston was after Miller's trial when two men working for Miller visited her home to speak with her. The court believes the victim is mistaken and credits Atty. Flanagan's testimony as accurate concerning his display of the photograph to Elizabeth shortly before the commencement of the trial. As discussed infra, Atty. Flanagan was under the impression in November of 1983, based on representations made to him by Det. Carvalho, that the police had, in fact, already shown Johnston's photograph to the female victim. Det. Carvalho's representation was inaccurate.
At the criminal trial, Det. Carvalho testified that he took over the investigation after Lieutenant Tierney retired in September. He indicated that the department was selecting photographs from its files of individuals who were thirty five to forty years of age, and taking them for Elizabeth's viewing. He claimed that Officer Collins had selected most of the photographs. At the habeas hearing, Det. Carvalho testified that "just about every picture that we had of white males was shown to her." Unfortunately, this sweeping claim was an erroneous statement of the facts in regard to the two photographs of Johnston in the possession of the Danbury Police Department. Both photographs, marked as exhibits, were "mug shots" taken by the Danbury Police Department in connection with its previous arrests of Johnston. Respondent's Exhibit II. One photograph is dated January 8, 1970; the other is dated April 13, 1967. Both show his hair as wavy and brushed back. His face appears large, with a flattened nose and large lips.
When asked why Johnston's photograph was not shown to the female victim, the reasons given were twofold: Officer Enteado, who now works in the identification section of the department, but who did not then occupy that position, and was not involved in the investigation, offered the observation that as a general matter the police try to make the age of the photograph as similar as possible. If that was the policy, it was not followed in this instance. Among the three hundred seventy seven "mug shots" shown to the female victim from the police files are photographs taken in CT Page 1864 1955, 1965, 1967 and several photographs taken in 1970 and 1971 as well as photographs from numerous other years. The second reason given for not including Johnston's photograph among those selected was the claim that police officers only selected those men who had characteristics similar to the descriptions of the assailant. Aside from the fact that Johnston did, in fact, have many characteristics similar to descriptions of the assailant, a review of the three hundred seventy seven photographs belies this assertion. In its review of the photographs, the court observed that there are photographs of men who appear to be in their sixties, fifties, forties, and twenties. There are men who appear stocky and men who appear gaunt. There are men with receding hairlines, others with hair covering their foreheads. There are men with straight hair, others with curly hair, others with wavy hair, some men with thin hair, others with thick, bushy hair. There are men with mustaches, others with beards, and a few with goatees. In sum, the court finds that the only common thread among these photographs is that they depict white men. The claim that photographs were selected for having features similar to the descriptions of the assailant is contradicted by the evidence of the photographs themselves.
There was also evidence relating to the Danbury Police Department's relationship to Johnston which causes the court concern. It is apparent from a review of all the habeas evidence that Johnston was well known to detectives of the Danbury Police Department. Officer Collins testified that he had known of Johnston prior to the Clapboard Ridge assault on the basis of an earlier stolen car investigation. He said Johnston was not a suspect. Similarly, Det. Carvalho, who has been a police officer since 1968, said that prior to this assault he knew of Johnston through other police departments. He claimed that Johnston was not a suspect in this case. On the other hand, Detective Robert Lollie testified that Johnston's name had come up as a suspect early in the beginning of the case. Det. Lollie testified that at the time of the Clapboard Ridge assaults, Johnston was known by members of the detective division as a person of violence. He knew that another detective had previously arrested Johnston for attempted rape. He also knew that Johnston had lived less than a mile from the crime scene, and that he had family who lived less than a mile and one half from the crime scene. In spite of this knowledge, Det. Carvalho testified that as far as he was concerned Johnston was not a suspect, and the first time his name came to his attention was the day Miller was arrested.
Det. Carvalho did acknowledge, however, that one or two months CT Page 1865 after Miller's arrest, had spoken with Johnston. He stated that at one point when he was driving his automobile, he observed Johnston at his sister's house near Candlewood Lake in Danbury working on a car. Det. Carvalho testified that he stopped his vehicle and beckoned him, but that Johnston was hesitant to approach the car. He testified that he was aware at the time that Johnston had made a remark that he knew who had committed the crime. He asked Johnston who did it, if he knew, and Johnston said that someone down Rogers Park did it. Det. Carvalho testified that he next asked Johnston if he was sure he had not done it. He stated that Johnston told him to get lost and walked away.
When asked how he had recognized Johnston while he was working on his sister's car, Det. Carvalho stated that he knew him by face, that he had seen him around the police department. During the habeas hearing, there was also testimony that Johnston's brother, David Johnston, had been a Danbury police officer, and that he is now retired and living in California. And, there was evidence that Johnston had been arrested on previous occasions by the Danbury Police Department. It is not clear whether Det. Carvalho recognized Johnston as having been around the police department as a result of his relationship with his brother, or as a result of experience, with the Danbury Police Department as a criminal defendant. Det. Carvalho testified that he is unsure whether he filed a report of his post-Miller arrest conversation with Johnston.
It is clear this confrontation was never reported to the State's Attorney. More disconcerting is the failure of Det. Carvalho to report a subsequent taped interview of Johnston while Johnston was in the custody of the New Milford Police Department in February of 1983, after Miller's arrest but before the trial. While the topic of that interview has been discussed supra, the court's present focus is on the failure of the police department to report this information to the State's Attorney so that he could fulfill his obligation to Miller as a criminal defendant. Detective Lollie testified that in February of 1983 he was invited to attend a meeting with Johnston and a number of other police department detectives. He had been told that Johnston had indicated that he wanted to confess his past crimes. At the habeas hearing, Det. Lollie testified that when it was his turn to ask questions of Johnston, he asked him about the Clapboard Ridge assaults. When asked by the court why he chose this assault as a topic of questioning with Miller already under arrest, Det. Lollie noted that Johnston's name had come up early in the investigation as a suspect. CT Page 1866
Det. Lollie taped this interview with Johnston. Relevant to the court's consideration is Detective Lollie's admission that once he returned to the police department he told Detective Carvalho and Lieutenant Johnson (n.b. the spelling of the last name; this officer is not the brother of Daniel Johnston.) about the interview, and placed the tape in his locked desk. During the habeas hearing, it became evident to the court that the State's Attorney's office was not told about this tape until a few days before the commencement of the habeas hearing, at which time the tape was promptly turned over to counsel for the petitioner.
Notwithstanding the professionalism and diligence of the State's Attorney's office in regard to this taped interview, the failure of the Danbury Police Department to reveal the contents of this interview to Miller violated his right to exculpatory information. The Supreme Court has noted that, "We have long recognized the common-law duty of the prosecutor to `ensure that all evidence tending to aid in ascertaining the truth be laid before the court, even though such evidence is not consistent with the prosecution's contention that the accused is guilty.' (citations omitted.) Moreover, the state is constitutionally obligated to disclose certain information to a defendant. The principles of due process require the prosecution to disclose exculpatory evidence that is material to a defendant's guilt or punishment. Brady v. Maryland, supra, 87." State v. Rasmussen,225 Conn. 55 (1993). In addition to this common law mandate, both C.G.S. 54-86c and Practice Book 741 require the prosecuting authority to disclose to a defendant "all exculpatory information and material." Sanctions for failure to make these disclosures include, inter alia, dismissal of the charges. In this case, where it is clear from the evidence that the State's Attorney was never made aware of the New Milford meeting, the failure of the prosecuting attorney to disclose this information was not due to prosecutorial misconduct. "Suppression by the prosecution of evidence favorable to the accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecutor." (Citations omitted)State v. Packard, 181 Conn. 258 (1981).
The Supreme Court has held that, in order for the court to consider claims of non disclosure of exculpatory material, the defendant must demonstrate that the prosecution suppressed evidence, that the evidence was favorable to the defense, and that it was material. State v. White, 229 Conn. 125 (1994). CT Page 1867
As to the obligation to disclose, it is not legally significant that the Danbury police failed to inform the State's Attorney. "The State's duty of disclosure is imposed not only upon its prosecutor, but also on the State as a whole including its investigative agencies. Therefore, if the [exculpatory material] were held by the . . . police department we would be compelled to conclude that, constructively, the State's Attorney had both access to and control over the documents. . . ." (Citations omitted) Demersv. State 209 Conn. 143, 153 (1988).
The "information or material" to which the court refers is the tape recording of Johnston's statement as well as the information that the interview took place and who participated.
As to the first test, the court finds that the information was suppressed. Det. Lollie locked the tape in his desk drawer. While he told two other police officers about it, no report was filed. No information about this interview was reported to the State's Attorney. The court also believes that information about this interview was favorable to the defense. In this regard, and as discussed supra, Johnston stated that Miller did not commit the crime and he indicated he had given another name to Det. Carvalho. The fact that the statement, itself, would not have been admissible, does not negate the State's obligation to provide information about it to the defense. Certainly, armed with the statement, counsel for Miller would have been in a position to talk with Johnston and with other police officers present during the interview.
The non-disclosed material or information must also be material to the defense. The standard for determining materiality was set forth in United States v. Bagley, where the Supreme Court indicated that nondisclosed exculpatory evidence will be considered material only if `there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."473 U.S. 667 (1985).
In reviewing this information, the court is mindful that it must isolate from its consideration all of the other information about Johnston that has been presented at the habeas hearing and consider this issue solely in the context of the trial evidence. Thus, the court looks only to the statement given by Johnston and CT Page 1868 the circumstances surrounding the New Milford interview in determining whether a reasonable probability exists that, had the evidence been disclosed to the defense, the result at trial would have been different. The court answers this question in the negative. In making this assessment, the court will not speculate as to what further information counsel might have developed upon further investigation of the New Milford incident. The court concludes that there is insufficient probability that the disclosure by the State of the tape and information about the New Milford meeting with Johnston would have likely changed the outcome of his trial. This non-disclosure of exculpatory information would not, by itself, entitle the petitioner to a new trial.
Finally, in regard to the issue of the Danbury Police Department's handling of the identification issue, is the misinformation provided by Det. Carvalho to the State's Attorney concerning the police department's failure to show Johnston's photograph to the female victim. While evidence adduced at the habeas hearing demonstrated that as soon as Miller was arrested, he brought Johnston's name to the attention to the police, Atty. Flanagan testified that the first he became aware of Johnston was in October of 1983 when he was interviewing Acting Sheriff George Grenier of the Putnam County Police Department in preparation for trial. Atty. Flanagan testified that during this interview, Sheriff Grenier expressed his belief that Johnston should be a suspect, and that at that meeting, he asked Sheriff Grenier to obtain a photograph of Johnston for him. Atty. Flanagan testified that he then spoke with Det. Carvalho who told him that Elizabeth had already seen a photograph of Johnston and had not selected him. At the habeas hearing, Atty. Flanagan testified that, in fact, Johnston's photograph was among the three hundred seventy seven photographs shown to the victim and that these photographs were all presented during the trial. The State's Attorney was clear and insistent in this belief. He was also misinformed.
At the habeas hearing on this topic, Det. Carvalho's testimony was confused. At one juncture, he claimed that Johnston's photograph had been shown to the female victim shortly after Miller's arrest, and he testified that the photograph utilized was the one identified as Petitioner's Exhibit 7. Det. Carvalho's testimony is misspoken. The court accepts as accurate Atty. Flanagan's testimony that after he spoke with Sheriff Grenier in October of 1983 when he asked him to obtain a photograph of Johnston, Sheriff Grenier supplied a photograph which the Putnam County Sheriff's Department had taken in August of 1983. This CT Page 1869 photograph was transferred from the Sheriff's Department to Det. Carvalho who brought it to Atty. Flanagan. Atty. Flanagan testified that when Det. Carvalho brought the photograph to him, Det. Carvalho asked him why he was bothering to show the victim Johnston's picture. He claimed that she had already been shown Johnston's mug shot and had not identified him. The court credits as trustworthy Atty. Flanagan's testimony that Det. Carvalho questioned his intentions to show the victim the photograph with an attitude that suggested, "like why are you doing it." As previously noted, evidence adduced at the habeas hearing conclusively demonstrated that Elizabeth was never shown Johnston's mug shot by the police. The first time she was ever shown any photograph of Johnston was in November of 1983 when she met with Atty. Flanagan. At that time, Atty. Flanagan, believing that she had already been shown a photograph of Johnston, showed it to her alone and asked her if she had ever seen the person before. She said no. As discussed infra, once Elizabeth had already made an identification, it was unlikely that she would make a different one.
Before moving from a consideration of the identification issues, the court notes that during the habeas hearing the victim reasserted her identification of Miller as her assailant. Though there was no evidence that she was given the opportunity, prior to her January testimony, to see Johnston in person in conjunction with either of his two appearances in court in December for the habeas hearing, she did, once again, look at the photograph she had been shown by Atty. Flanagan, and, once again, she stated that the photograph was not of the man who assaulted her in 1981.
While the court finds that the female victim's identification of Miller is based on her sincere belief, her persistence is neither unusual nor critical. As stated by the Supreme Court inUnited States v. Wade, ". . . it is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then before trial." 388 U.S. 218 (1967). Writing for the minority inUnited States v. Ash, Justice Brennan opined that this propensity is no less present when the initial identification is made from a photographic array. 413 U.S. 300 (1973). In Simmons v. UnitedStates, Justice Harlan said: "Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent CT Page 1870 lineup or courtroom identification." 390 U.S. 377, 383-384 (1968) The Court, in Manson v. Brathwaite, put the proposition in another way when it noted that once a witness has identified a person, "it is impossible to imagine his responding negatively to such questions as `is there any doubt in your mind whatsoever' that the identification was correct." 432 U.S. 98 (1977).
In consideration the identification issue, the court is mindful that, at trial, the female victim's identification of Miller was the heart of this otherwise circumstantial case. And the court is mindful that the identification procedures utilized by the police passed judicial scrutiny. Those judicial findings do not, however, diminish the potential fallibility of identification testimony. The often quoted assertion by Justice Frankfurter is pertinent: "What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent-not due to the brutalities of ancient criminal procedure." Frankfurter, The Caseof Sacco Vanzetti 30 (1930). As Justice Brennan stated in Ash, in commenting on the Court's earlier opinion in United States v. Wade, "At the outset, the Court noted that `identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially derogate from a fair trial.' (Citation omitted). Indeed, the vagaries of eyewitness identification are well-known, the annals of criminal law are rife with instances of mistaken identification." 413 U.S. 300 (1973).
The Connecticut Supreme Court has expressed its awareness of the significant impact eyewitness identification can have on factfinders. In State v. Gordon, the victim, who was the only eyewitness to the crime, insisted that she was totally certain that the defendant was her assailant. Reversing the conviction on the basis that the identification procedure had been tainted, the Court opined, "Such identifications were of a uniquely damaging character." 185 Conn. 402, 403 (1981).
While it has been established in this case that the procedure was not tainted, the court finds that additional evidence that the victims were not shown Johnston's photograph until after Miller had been arrested tends to erode confidence in the female victim's initial and continuing identification of Miller as her assailant.
The court notes also, that on cross examination of Johnston, CT Page 1871 counsel for the respondent showed him a number of photographs of teenagers, one at a time. Upon showing him the first photograph, counsel asked him if he could identify the person, and as she showed him each of the next seven photographs, counsel asked Johnston whether the photograph was of the boy he beat. He was unable to identify any of the photographs as that of the male victim. Thereafter, counsel showed him eight photographs of female teenagers, one at a time, each time asking Johnston if the photograph showed the girl he beat. He was unable to make a positive identification of any in this series. In later testimony, Atty. Flanagan testified that he had put together the groups of photographs with the thought that if Johnston were able to pick out the victims from them, the court's task would be easy and, correspondingly, if Johnston were not able to recognize his victims from the groups, the court's decision making process would be easy. The court did not find this effort to be a serious contribution to the fact finding process. This evidentiary adventure was no more helpful to the court's decision-making responsibility than was the victim's re-assertion, albeit sincerely believed, that Miller was her assailant.[8]
As a final comment on the identification process, the court notes that early descriptions of the assailant describe his complexion as reddish. Approximately three days after these assaults, when Johnston was admitted to the hospital, his skin was noted to be "pink, hot to touch" Petitioner's Exhibit 20. While this observation may be explained the fact that he had a fever on admission, the court is also mindful of Investigator Allen's testimony concerning the New Milford interview that Johnston became, "red in the face" when Larry Miller's name was mentioned.
E. CIRCUMSTANTIAL EVIDENCE
At the habeas hearing there was substantial circumstantial evidence to corroborate Johnston's testimony. It was clear to the court that Johnston was familiar with the crime area, having, at one point in his life, lived less than a mile away and having a grandparent who lived approximately one and one half a mile distant. He had other family in the area. A New York Parole report dated April 15, 1982, filed in conjunction with Johnston having been picked up for a violation of parole, contains the notation that "Subject claims he has a brother on the Danbury Connecticut P.D. who will be able to help him with employment." Petitioner's Exhibit 57. In the same report is the notation that Johnston had stated that his wife and child live with his sister in Danbury and CT Page 1872 that Johnston had stated that his brother is a lieutenant on the Danbury City Police Department and he would also be willing to help him. Additionally, the body of the victim Johnston murdered after the Clapboard Ridge assaults was found approximately one mile from this crime scene. Thus, it appears that he had contacts in the Danbury area, as well as in an area proximate to the crime scene.
It is also clear that in the summer of 1981, Johnston's life was in disarray. The Virginia Parole Report indicates that Virginia had reported that Johnston had left his residence and employment in Virginia without permission in late summer and fall of 1981. From July 31, 1981 and thereafter he had failed to report to his parole officer, and that on October 31, 1981 he had left his employment without permission. He was picked up by the Duchess County Sheriff's Department on February 17, 1982 based on their knowledge that he was wanted as a parole violator. As some corroboration of this geographic instability, the form completed upon Johnston's admission to the Chesapeake Hospital reflects that he had moved approximately one month earlier.
There is also evidence that he was in the area at the appropriate time. When he was admitted to the Chesapeake hospital on August 24, 1981, he reported that he had been in the New York area a few days earlier.
By the time of the Clapboard Ridge assaults Johnston had amassed a substantial criminal record of violent, assaultive behavior, directed, in the main, against women. He had also been identified as a sexual deviant. Johnston's New York Parole Report indicates that he had been incarcerated in June of 1979 for beating a woman and stealing her pocketbook. In a psychiatric report dated 1979, it is reported that Johnston is serving time for having threatened a woman with whom he had forced sexual contact. Following a review of Johnston's family history is the notation, "It is obvious they were unwanted by their mother." Petitioner's Exhibit 57. As noted supra, he was arrested in Danbury in 1970 for Assault with the Intent to Commit Rape. The Parole Report indicates that in June of 1972, he received a sentence of three years for Attempted Robbery, a crime ". . . with sexual connotations".Id. The report contains the notation that Johnston's offenses ". . . appear to indicate sexual deviancy." Id. Johnston's NCIC corroborates and adds to the criminal history reported in his New York Parole Report. The last notation on his NCIC is that he was arrested for Murder, Sexual Abuse, and the Unauthorized use of a Motor Vehicle in 1986. On these charges, it appears that he was convicted of CT Page 1873 Second Degree Murder. The victim was a woman whose breast appeared to have been bitten. And, she was strangled.
In addition to his history of violence toward women, there was evidence introduced at the habeas hearing of Johnston's ModusOperandi intended to demonstrate certain common characteristics of his crimes. Much of this testimony related to crimes in which Johnston was a strong suspect, but crimes for which he had not been convicted. The court is aware that, at a criminal trial the court could admit, as evidence of a signature crime, testimony regarding uncharged criminal behavior under circumstances in which it can be determined that the characteristics of the criminal behavior are distinctive and unique, and where the probative value of the testimony outweighs its prejudicial effect. State v. Figueroa,235 Conn. 145 (1995). Presumably on this basis, the petitioner offered evidence that Johnston had made an inculpatory telephone call relating to a shooting in Bedford, New York, where the content of the phone caller's statements was similar to the phone call received by the New York State Police after these assaults. Atty. Randall Lawrence, a former police officer who investigated the Bedford shooting, testified that he had known Johnston for several years by the time of the Bedford shooting, and he was involved in the investigation. He testified that after listening to the tape of the Bedford call, he was certain that the voice was Johnston's. Johnston was never charged. Additionally, the F.B.I. analyzed the tape and were not able to identify the voice. The petitioner also offered evidence through the testimony of police officers of several "lovers lane" type crimes in Putnam County, New York where the officers believed that Johnston had been the perpetrator. In evaluating this petition, the court did not consider this evidence of uncharged crimes because the court did not find it sufficiently reliable as proof that Johnston did, in fact, commit the uncharged crimes. Similarly, the court has not assessed as probative the evidence that Johnston had previously been charged with impersonating a police officer because, at the habeas hearing, there was no evidence that he was, in fact, found guilty of this particular charge. Nor was there any evidence of the specific allegations which gave rise to the original impersonation charge.
The court does consider Johnston's propensity to communicate with the police as some evidence tending to corroborate his statement. In the Clapboard Ridge assaults, the New York State Police received a phone call at their Brewster sub-station from a man who indicated he had just left two individuals for dead in back of the church in Clapboard Ridge Road. Johnston testified that he CT Page 1874 made that call which the police did not mechanically record. There was other evidence that Johnston has a history of making phone calls to the police to discuss crimes. In the murder case for which he was convicted, Johnston had called the Putnam Sheriff's office on several occasions prior to his arrest, and even appeared at the station once, to say that he wanted to talk with the police to help them with the investigation. This behavior is oddly similar to Johnston's visits to the Miller residence with claims of special knowledge and offers of assistance.
There was evidence that Johnston and Miller knew one another. Prior to his employment as a Federal corrections officer, Miller had worked as an officer in the Putnam County, New York, Sheriff's Department. In this context, he had come into contact with Johnston. He had, in fact, transported Johnston to prison on one occasion. On another occasion, Johnston had threatened Miller and Miller's family. Sheriff Grenier testified that his concern for the Miller family's safety was sufficiently great that he placed guards at their home. Johnston testified that he had not liked Miller and that he was initially pleased to see that he had been arrested. The court does not credit this evidence as probative regarding Johnston's culpability but it may have some bearing on his failure to come forward at an earlier date. While the factors that may or not motivate Johnston are beyond the reach of this court, his early antipathy for Miller, as well as for authority in general, was well established at the habeas hearing.
V. FINDINGS AND ORDERS
From its review of the trial evidence and the evidence adduced at the habeas hearing, the court makes factual findings as well as conclusions regarding the law as it pertains to the petitioner's claims. In reviewing the evidence, the court is mindful of its responsibility not only to state its findings as to the facts the court finds to be proven, but to make findings regarding the quality, or strength, of the evidence upon which the court has made its factual conclusions. Thus, the court expresses its view of not only "what" the petitioner has proven, but also of "how well" the petitioner has proven his claim of factual innocence, and, accordingly, the degree of confidence to which the evidence is entitled.
The court finds that the petitioner has proven that he is factually innocent of the assaults that occurred on August 20, 1981 on Clapboard Ridge in Danbury, Connecticut. The court further finds CT Page 1875 that evidence of Miller's factual innocence is so persuasive that it undermines the State's entire case so that, if presented with all the evidence adduced at the criminal trial as well as the probative habeas evidence, no reasonable factfinder would find Miller guilty of the Clapboard Ridge assaults.
The evidence upon which the court relies in finding that the petitioner has proven his factual innocence is the trial testimony and exhibits, as well as the following habeas testimony: the gun evidence; the medical evidence relating to both the female victim and Johnston, including the contents of their hospital records; Johnston's in-court testimony, together with his various utterances about the assaults over the years; the evidence that the victims never saw Johnston's photograph at any time prior to the identification of Miller by Elizabeth, together with Johnston's substantial physical similarity to the descriptions of the assailant made by the victims shortly after the crime; the evidence of Johnston's familiarity with the Danbury area, and the crime scene; and his substantial record of criminal violence toward women leading to a summer in which it appears that his life was in disarray.
In formulating its view that the habeas evidence has completely undermined the State's case, the court has also considered the fact that the State's evidence in the underlying criminal case was largely circumstantial with the exception of the female victim's identification of Miller. Thus, the court considered not only the habeas and trial evidence as cumulative, but the court has assessed the likely impact the habeas evidence would have on the willingness of a reasonable factfinder at trial to make inferences and draw factual conclusions from the circumstantial evidence presented against Miller, as well as the identification testimony presented at the criminal trial.
In its analysis of the evidence, the court is mindful that, while the Supreme Court has recognized factual innocence as a cognizable habeas claim, even in the absence of an antecedent constitutional violation that affected the result of his criminal trial, the evidentiary hurdle a successful petitioner must surmount is high. cf. Summerville v. Warden, 229 Conn. 397 (1994). And while the particular standard has not been articulated, the court assumes, arguendo, that the quality of the petitioner's proof in order to gain habeas relief must be such that his evidence establishes his factual innocence, and not merely his legal innocence, and it must establish his factual innocence by proof CT Page 1876 greater in quality than that which merely establishes that, at a new trial, he would probably be found not guilty. Also, in making its determinations, the court assumes that the petitioner's evidence must be greater in quality than that which would show, at the habeas hearing, that he is probably not guilty of the crimes. In concluding that the petitioner has proven his factual innocence, the court finds that he has surmounted these evidentiary obstacles.
The court recognizes from Summerville that the evidence must be greater in quality than the evidence one must produce to obtain a new trial pursuant to the provisions of C.G.S. 52-270. Under that standard, the Appellate Court has noted that, "a new trial is granted if the petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence (1) is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence, (2) would be material on a new trial, (3) is not merely cumulative, and (4) is likely to produce a different result in a new trial." Johnston v. State, 36 Conn. App. 59 (1994), citingAsherman v. State, 202 Conn. 434 (1987).
One of the reasons a factual innocence claim brought through a habeas petition must, in order to be successful, meet a higher standard than that which is required in a petition for a new trial, is that the habeas claim is not time barred. Thus, in assessing a habeas claim, the court must pay particular attention to the concern that a factual innocence claim brought several years after the criminal trial can present special problems relating to the retrial of the matter. The court assumes, therefore, that in addition to having to meet a stricter standard in regard to the quality of the evidence, a successful factual innocence habeas petitioner must also satisfy the minimum prerequisites for a new trial under C.G.S. 52-270. The court thus views the statutory requirements for a new trial to be "lesser included" requirements. This petition meets those requirements. The evidence presented to the court is newly discovered, and could not have been discovered earlier with due diligence. Indeed, it appears that the failure of the Danbury Police Department to relay information concerning Johnston contributed to the delay in receiving information about him at least as much as Johnston's prolonged cat and mouse game. Any delay in the matter has not been occasioned by a failure of vigor or timely pursuit by the petitioner. The evidence adduced at the habeas hearing is not only material but central and non-cumulative, and it is likely to produce a different result at trial.
The Summerville court rejected as sufficient for a free CT Page 1877 standing factual innocence claim the standard it had previously announced for granting of a new trial pursuant to a habeas petition based on ineffectiveness of counsel. Id., 429. cf. Bunkley v.Commissioner, 222 Conn. 444 (1992). In Bunkley, the court adopted as a standard, "whether there was a reasonable probability that, but for [the petitioner's] counsel's failure, the verdict would have been different." Id., 457. In rejecting the Bunkley standard for a factual innocence claim not accompanied by an antecedent constitutional claim, the Summerville court opined, "This critical difference between the two cases, and the roots that the Bunkley
standard has in the unreliability of the first trial's factual outcome-roots that the petitioner's claim in this case does not share-persuade us that the Bunkley standard is inadequate to respond to the case of a claim of actual innocence unconnected to an antecedent constitutional violation that affected the reliability of the outcome of the first trial." Summerville v.Warden, supra, 229 Conn. 431. Mindful of this language inSummerville, the court makes clear that it has analyzed this petition as one without an antecedent constitutional claim which would undermine the reliability of the criminal trial. Thus, while the court has noted its concern about the identification process utilized by the Danbury Police Department, the court concludes that these commissions and omissions did not directly impact on the fairness of the trial. Rather, they implicate the investigative process, a matter which does not have a correlative habeas impact. It is the fact, and not the reasons, that the victims were not timely shown Johnston's photograph that erodes confidence in the conviction. Though they may be the occasion for intra-departmental scrutiny, the reasons for the failure are not legally significant.
Similarly, while the court has found that the information relating to the New Milford interview should have been disclosed as exculpatory information, the court has explicitly found that the failure to provide this information did not render the trial process unfair. To the extent the court finds that this failure impacted on the present unreliability of the trial outcome, that is a factual finding relating to the petitioner's claim of factual innocence; it does not bear on the question of legal innocence at the time of trial.
As to the quality of the petitioner's proof, the court finds that the petitioner has proved his factual innocence by clear and convincing evidence. In utilizing the phrase, "clear and convincing", the court is mindful of the judicial gloss which has been applied to this terminology. Thus, the court finds that the CT Page 1878 petitioner's evidence does induce in the court's mind the belief that the facts asserted by the petitioner are "highly probably" true, that the probability that they are true or exist is "substantially greater than the probability that they are false or do not exist." Dacey v. Connecticut Bar Assn., 170 Conn. 520, 537
(1976), State v. Davis, 229 Conn. 285 (1994). And the court is mindful of the Supreme Court's admonition that the clear and convincing evidence, as a standard of proof, "should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory."Lopinto v. Haines, 185 Conn. 527 (1981). At the risk of linguistic mimicry, the court finds that the petitioner's evidence is, in fact, "a truly persuasive demonstration of actual innocence" cf.Herrera v. Collins, 113 S.Ct. 853 (1993) And, given that the thrust of the petitioner's evidence is that Daniel Johnston, and not he, committed the Clapboard Ridge assaults, the court finds that the petitioner's evidence points, "unerringly to (his) innocence." In re Clark, 855 P.2d 729 (cal. 1993).
In assessing the petitioner's claim, the court has also assumed that he has the burden of presenting evidence which supports his factual innocence, that is, that he is innocent in fact, and not simply that he may be legally innocent, that is, that his guilt could not be established beyond a reasonable doubt. The court's findings in this matter relate to the petitioner's factual innocence. The court has assumed, as well, that the petitioner, having been convicted of the assaults at trial, bears a heavy burden of overcoming the presumption of the correctness of the underlying conviction. He has met this burden.
The court has also viewed this petition as "free standing" and as not relying on an antecedent constitutional claim. As notedsupra, the petitioner withdrew his claims of ineffective assistance of counsel as well as prosecutorial misconduct. In addition, while the court found that the failure of the Danbury Police Department, and, accordingly, the State's Attorney, to turn over information relating to the New Milford interview to Miller violated his rights to exculpatory information, the petitioner did not pursue that claim as one implicating his right to a fair trial, in the constitutional sense.
While the court is aware that it would be all too facile merely to reiterate all the possible standards proffered by the court in Summerville, the court is convinced, that under the unique facts of this petition, this petitioner's evidence is not only CT Page 1879 truly persuasive but has so undercut the vitality of his underlying conviction that it is left with no substantial indicia of reliability.
The court notes that the respondent in Summerville proposed as a standard that a writ should issue "only upon the most compelling evidence that a miscarriage of justice has occurred." Id., 433. Indeed, the court finds in this instance that the evidence adduced at the habeas hearing together with the trial evidence supports such a conclusion. Under the facts of this case, the court finds that Miller's continued incarceration, resulting from his criminal conviction, is unjust.
In stating its belief supra that no reasonable factfinder would find the petitioner guilty, the court has purposefully declined to posit that no reasonable factfinder could find the petitioner guilty. The reasons for this do not relate to the quality of the evidence. Rather they concern the court's view of its role as a habeas judge. The court believes that to say that no reasonable factfinder could find guilt is to suggest that the habeas court should substitute its factfinding determinations for the jury's, that the habeas court should act as the ultimate factfinder, rather than an evidence assessor. In this case, the petitioner has not claimed, and the court has not found, that the evidence adduced at trial was insufficient to support the jury's verdict. To say now that no reasonable factfinder could find guilt would be to deny the underlayment of trial evidence which has not been eliminated by the habeas evidence. While the court has come to the view that the habeas evidence not only points clearly and convincingly to the petitioner's innocence and erodes the reliability of the trial evidence, that is not to say that the trial factfinder must therefore be legally precluded from making its own determinations concerning the evidence if the case is retried. That conclusion, the court believes, would be tantamount to an unwarranted intrusion into the factfinding responsibility of the jury, and would be an invitation in future matters for the habeas court to substitute its personal beliefs for those of the jury.
In adopting the more probabilistic view that no factfinderwould find guilt, the court has been aided by the discussion of the Supreme Court in Schlup v. Delo, 115 S.Ct. 115 (1995). There, while the underlying claims involved a constitutional allegation, thereby perhaps implicating a different standard, Justice Stevens writing for the majority stated, "The meaning of actual innocence as formulated by by Sawyer and Carrier does not merely require a showing CT Page 1880 that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses' rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."(Emphasis added)Schlup v. Deno, supra. In this case, the court concludes that based on the new evidence, that the evidence of Johnston's actual guilt and Miller's actual innocence so undermines the State's entire case and is so persuasive that no reasonable juror would find Miller guilty. And in making this determination, the court assumes that a reasonable juror would consider fairly all the evidence presented and conscientiously obey the instructions of the trial court.
The court recognizes that in finding that the petitioner has made the requisite showing of his factual innocence, it has concluded that the petitioner has, in fact, made a stronger showing in order to obtain habeas relief than he would have to make at the underlying trial in order to be found not guilty. Given the competing interests in the finality of judgments, and the effect on successful prosecution that the granting of this petition may cause, and mindful of the injustice of the continued incarceration of the petitioner, the court feels it is proper to impose on the petitioner the high burden of proving his actual innocence in the habeas court even though, at trial, he would merely have to satisfy the jury of his legal innocence. Whether or not this burden may be reasonable for other petitioners, it has been met by this petitioner.
Having determined that the petitioner has met his high burden of proof, the court turns now to the question of relief.
C.G.S. 52-470 states that the habeas court shall, ". . . inquire, fully into the cause of imprisonment, and shall thereupon dispose of the case as law and justice require."
While the right to habeas corpus in enshrined in both the United States and the Connecticut Constitutions, the precise nature of the writ, and the relief which may be granted to a successful habeas petitioner, have been shaped by decisional law. The essential purpose of habeas as a vehicle to free a person whose CT Page 1881 confinement is unlawful is a constant thread in Connecticut jurisprudence. As early as 1784, the New Haven County Superior Court issued a writ of habeas corpus to bring before the court a former slave whose confinement had been caused by his former master. Utilizing the writ of habeas corpus, the court determined that the former slave had been manumitted by his military service in the Continental Army, and he was ordered discharged from confinement. 1 Root 92. More recently, our Supreme Court has defined habeas corpus "[A]s a remedy for illegal restraint. . . .a prerogative common-law writ providing a special and extraordinary legal remedy." Wojculewicz v. Cummings, 143 Conn. 624, 627 (1956). In Summerville v. Warden, our Supreme Court stated that "[t]he principal purpose of the writ of habeas corpus is to serve as a bulwark against violations of fundamental fairness." supra,229 Conn. at 326-27. It's use in this matter is yet another strand in the continuing thread of justice.
Recently, our Supreme Court has stated that the habeas court has discretion in fashioning the relief to be granted. Medley v.Commissioner, 235 Conn. 413 (1995). While the court has the power to order the unconditional release of a successful habeas petitioner, the court is not "confronted with the dilemma . . . of having to choose between ordering an absolute discharge of the prisoner and denying him all relief." (Citation omitted), Gaines v. Manson, 194 Conn. 510
(1984). In Federal jurisdiction, while the form of relief is set forth in applicable Federal rule, it is typical for the court to order the conditional release of a successful petitioner. That is the course the court follows in this instance.
Accordingly, the petition for a new trial is granted. That is not to say that there must be a new trial. The court understands and respects the unique authority of the State's Attorney to determine whether to bring charges.
The petitioner is ordered conditionally released from confinement. He shall be absolutely discharged unless within thirty days from the date of this Memorandum of Decision the State's Attorney for the Danbury Judicial District files with the clerk's office a written notice of his intention to proceed with a retrial of the petitioner. A copy of any such notice shall be provided to the petitioner, to his counsel of record in this habeas, and to the habeas court.
In the event the State's Attorney does file such a written notice, the petitioner shall be admitted to bail as determined by CT Page 1882 the appropriate court in the Danbury Judicial District.
In the event of an appeal from this decision by the respondent, the undersigned, sitting as the habeas court, shall retain jurisdiction to make, upon proper motion, a bail determination for the release of the petitioner while an appeal is pending.
The court appreciates the professionalism and diligence of all counsel in this manner.
The petition is granted in accordance with these terms.
BISHOP, J.